*Decision will be entered under Rule 155.*

DONALD L. HERRICK AND MARJORIE P. HERRICK, PETITIONERS V. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3649–83.     Filed August 5, 1985.

---

*Ben A. Douglas* and *Randall C. Johnson*, for the petitioners.
*Val J. Albright* and *Marty J. Raisanen*, for the respondent.

KÖRNER, *Judge*: Respondent determined the following deficiencies in petitioners' Federal income taxes:

| TYE Dec. 31— | | Deficiency |
|---|---|---|
| 1978 | .............................................. | $61,684.88 |
| 1979 | .............................................. | 13,491.35 |
| Total | .............................................. | 75,176.23 |

The issues for decision are whether petitioners are entitled to deduct depreciation or amortization expenses, interest expenses, and "annual use fees" in connection with an alleged new retail distributorship business.

Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and exhibits attached thereto are incorporated herein by this reference.

FINDINGS OF FACT

Donald L. Herrick (hereinafter Donald or petitioner) and Marjorie P. Herrick (hereinafter referred to, collectively, as petitioners) were husband and wife and residents of Dallas, Texas, at the time of filing their petition in this Court. Petitioners timely filed their joint Federal income tax returns, Forms 1040, for the taxable years ended December 31, 1978, and December 31, 1979. Petitioners filed an amended return for the year 1979, Form 1040X, on September 25, 1980.

Donald was a financial consultant during 1978 and 1979. As of the date of trial, he was also the chief executive officer or general partner of 22 entities, the majority of which were engaged in investment banking, oil and gas, or real estate.

Petitioner graduated from William Jewell College in Liberty, Missouri, in 1960.[1] From 1960 until August 1963, petitioner was employed by Connecticut General Life Insurance Co. (hereinafter Connecticut General) in Hartford, Connecticut, except for a 6-month period during which he was on active duty with the U.S. Army.

In August 1963, petitioner moved to Kansas City,[2] and was employed as an agent by Connecticut General until 1967. While working for connecticut General, petitioner became acquainted with Lewis F. Coppage (hereinafter Coppage). Coppage was employed as an agent by Connecticut General in Denver. In 1967, petitioner left his employment with Connecticut General and formed his own insurance brokerage firm; he also became involved in real estate activities in 1967, and in oil and gas production in 1968.

In July 1978, petitioner was approached by Coppage, who was at the time the president of Foresee, Ltd., regarding the possibility of becoming a TireSaver distributor. The promoter of the TireSaver was LSI International, Inc. (hereinafter LSI), a

---

[1] Petitioner attended law school for a couple of years prior to 1978, but did not graduate.

[2] The record is not clear as to whether petitioner moved to Kansas City, Kansas, or to Kansas City, Missouri.

Nevada corporation. LSI's goal, as stated in the promotional materials, was to establish local distributorships nationwide, with each local distributor having the exclusive right to distribute and sell all products covered by certain U.S. patents in a geographical territory in the United States. During 1978 and 1979, Marco Radomile was the president of LSI.

During 1978, petitioner received promotional materials[3] containing a detailed description of the TireSaver device, market information concerning the TireSaver statistical data, the distributor's program, a marketing study, information concerning the application procedures in order to become a distributor, and an opinion detailing the tax aspects of entering into a TireSaver distribution agreement. According to the aforesaid promotional materials, the TireSaver device consisted of a patented tire pressure monitoring system composed of several components operating together: (1) A pressure sensor mounted on the rim inside the tire; (2) a radio frequency combination transmitter and receiver component located in each of the four wheel wells of the automobile; (3) a dashboard component; and (4) the wiring necessary to connect the wheel well components to the dashboard component.

The promotional materials represented that the TireSaver tire pressure monitoring device was covered by U.S. patent No. 3,873,965, issued on March 25, 1975, that the component located inside the tires was covered by U.S. patent No. 4,023,415, issued on May 17, 1977, and that George E. Garcia of Tiburon, California, was the inventor of the TireSaver device. The marketing study contained copies of the aforesaid patents. The device was allegedly susceptible of being adapted for use in trucks, buses, and other vehicles. According to the prospectus, with some modifications not specified therein, the TireSaver had the capacity to alert the driver of a vehicle to surveillance by police radar.[4]

---

[3]One version of the prospectus or promotional materials produced at trial had a number of pages missing, other portions of the said promotional materials were crossed out and marked "outdated information, see new statement of facts." Petitioner could not explain the reason for this. No "new statement of facts" can be identified from the record.

The record contains another copy of the prospectus; the pages of this copy are not marked out, nor are there any pages which appear to be missing. Petitioners also submitted an older version of the promotional materials which does not mention the possibility of adding the radar detection feature to the tire pressure monitoring system.

[4]Neither the marketing study nor the patents contained in the promotional materials explain how the tire pressure monitoring system was to be modified to function as a radar detection device. Furthermore, neither one of the patents makes reference to such capability. See note 3.

The marketing study contained in the prospectus was prepared by J. Walter Thompson Co., Ltd., of London. The marketing study estimated that the potential market for the TireSaver could average at least 1 percent of the total market for passenger cars and 2 percent of all trucks and buses during the 30 to 36 months following the introduction of the device. The study stated that as of 1978, there were 119,690,561 automobiles and 29,429,126 trucks and buses in the United States. The study assumed that the corresponding percentage of the 3.9-percent new vehicles registered each year would also be equipped with the TireSaver. It was also assumed that the combination TireSaver tire pressure monitor and radar detector for use in automobiles would sell for $125 and that the combination unit for use in trucks and buses would retail for at least $235 during 1979.[5] The marketing study assumed, further, that the TireSaver combination tire pressure monitor and radar detector automobile unit could be purchased from a manufacturer by the distributor at $33.25 per unit, and that the truck or bus combination could be purchased for $50.50. The projected gross profit for a TireSaver distributor with an average territory (a territory containing 70,000 vehicles) was as follows:[6]

| Year | Gross profit |
|------|--------------|
| 1979 | $20,530 |
| 1980 | 23,040 |
| 1981 | 25,510 |
| 1982 | 28,734 |
| 1983 | 32,172 |

It was not explained in the marketing study, nor anywhere else in the promotional materials, how or what criteria were utilized in arriving at the assumed market penetration percentages, estimated retail prices for the TireSaver and combination TireSaver and radar detector system, or the cost of manufacturing the TireSaver and combination TireSaver and radar detection system.

---

[5] The method of determination of the average retail prices of the TireSaver combination is likewise not explained in the marketing study.

[6] The United States was to be divided into about 2,400 individual territories. These amounts are net of assumed normal retail margins, normal wholesale margins, per-unit distribution fees, costs of manufacturing, and normal commissions to manufacturer's representatives.

As of the date that the marketing study was prepared, a model or prototype of the TireSaver or the combination TireSaver and radar detection system had not been tested, manufactured, or produced.[7]

The promotional materials stated that distributorship fees were payable partially in cash and partially by recourse and nonrecourse notes. According to the promotional materials, for every $1 of cash invested, a TireSaver distributor would receive $4 of Federal income tax deductions, for the taxable year 1978.[8] For the taxable year 1979, the income tax writeoff was to be $3 for every $1 of actual cash investment.[9] The said cash investment was to be made by means of a recourse note payable in four installments during 1979.

The tax writeoff was to be achieved by means of nonrecourse promissory notes and a recourse promissory note for 1979, and the election of the accrual method of accounting for the distributorship activity.[10]

The promotional materials contained a tax opinion discussing the availability and legality of deductions in connection with TireSaver distributorship.[11] The opinion suggested that deductions could be obtained pursuant to section 1253,[12] and

---

[7]In preparing the marketing study, it was assumed that: (1) The TireSaver technology would be transformed into a workable and feasible product; a manufacturer would be found who would agree to manufacture the devices at the assumed cost to the distributors; and (3) there would be no problems with obtaining the necessary penetration of the market, and no warranty claims. In addition to the above assumption, it was assumed, in making gross profit projections for years after 1979, that: (1) The TireSaver products would not become obsolete; (2) there would be a 7-percent annual inflation with respect to both prices and costs; and (3) there would be a number of replacement parts sold for the TireSaver products.

[8]An example in the promotional materials states that with a cash investment of $11,500 and the signing of a nonrecourse promissory note for $46,000, a distributor in the 50-percent tax bracket would be able to claim a tax deduction in the amount of $46,000, and thus realize $23,000 in tax savings for 1978, as follows: $11,500 × 400% × 50% equals $23,000.

[9]An example in the promotional materials states that for 1979, a cash investment, viz, recourse note, in the amount of $5,750 accompanied by a nonrecourse note for $11,500, would yield $8,625 of the savings for a distributor whose income was taxed at 50-percent rates, as follows: $5,750 × 300% × 50% equals $8,625.

[10]The older version of the promotional materials guaranteed a 4-to-1 writeoff for both 1978 and 1979. The nonrecourse portion of the "amounts to be incurred" was only 3 times the amount of cash for each year, due to the difference in the form of the payments. Initially, the amounts were referred to as "disposition fees," as opposed to annual use fees, the term used in the later version. The distributor would incur the said fee should he dispose of his rights to distribute the TireSaver products. See note 3.

[11]The older version of the prospectus contains an opinion dated July 28, 1978, prepared by Meserve, Mumper & Hughes, a Los Angeles, California, law firm. The other opinion is dated Nov. 2, 1978, and was prepared by Pepper, Hamilton & Scheetz, a Philadelphia, Pennsylvania, law firm. Both opinions contain the language quoted *infra*.

[12]All statutory references are to the Internal Revenue Code of 1954 as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.

discussed whether the distributorship activity would constitute an activity engaged in for profit, whether the nonrecourse notes constituted bona fide indebtedness, and the possible application of the at-risk rules in section 465. Finally, the opinion referred to the adoption of a "Tax Shelter Program" by the Internal Revenue Service to identify and examine "abusive tax shelter returns." The opinion forewarned potential distributors that:

In this case, as in any leveraged tax shelter,* * * acquisition of a distributorship will be regarded by the [Internal Revenue] Service as an "abusive" tax shelter and, therefore, the likelihood that the purchaser's tax return will be subject to audit may be increased.

The promotional materials stated that:

In the event that a TireSaver Distributor adopts for tax purposes the position outlined in the LSI tax opinion and in the event the Distributor's deductions are challenged by the Internal Revenue Service, LSI will defend its tax position and that of its Distributors through each step of the Administrative process and, if necessary, before the United States Tax Court.

The older version of the promotional materials reviewed by petitioner[13] contained the following statement concerning other inventions and patents by George E. Garcia, the named inventor of the TireSaver device:

Patents in 1960 pertaining to hydraulics used in excavation; formed own company, "Hydraulic Equipment and Shovel Company" ("Hesco"), in Houston, Texas. Sold company Drott Manufacturing in Wausau, Wisconsin. Later Drott merged with J. I. Case, Co., which, in turn, is now owned by Tenneco. *Sales revenues generated by this patent have been in excess of $400,000,000 per year.*[14]

At the time when petitioner obtained the promotional materials, the TireSaver was not yet being produced; the prospectus so stated. The prospectus represented, however, that LSI had firm offers to manufacture the TireSaver from major industrial companies, and that no contract was to be

---

[13]See note 3.

[14]Robert D. Goddard, Director of Patents, Trademarks, and Licensing at J.I. Case Co. conducted a search of J.I. Case records pertaining to HESCO, Drott Manufacturing, George E. Garcia, and Garcia, Ltd., and was unable to locate any records of any patents covering hydraulic excavation devices invented by George E. Garcia.

entered into until all offers were adequately reviewed.[15] Potential distributors were required to be aware of the fact that no enforceable contracts had been executed and that the proposed wholesale and retail prices in the promotional materials and in the distributorship agreement were estimates based upon negotiations with unnamed manufacturers.

LSI advised potential distributors to consider the fact that LSI was a newly formed company whose sole purpose was to acquire and exploit the distribution rights for TireSaver, and that although the management of LSI had "significant general business experience" (not detailed in the promotional materials), it had never marketed an automotive product.

An individual, partnership, corporation, or other entity desiring to become a TireSaver distributor had to fill out an application.

The final prospectus distributed by LSI contained the following questions and answers, among others:[16]

What are the tax aspects of becoming a TireSaver distributor? The tax aspects of becoming a TireSaver distributor may be very advantageous. As more fully stated in LSI's legal opinions non-recourse notes paid to LSI in 1978 and 1979 will be fully deductible, allowing a TireSaver distributor a tax deduction of 400% of his 1978 cash investment and 300% of his 1979 cash investment.

Will I be audited if I make this investment? If you are the type of high inc[o]me taxpayer suitable for a tax shelter investment, you are unusual if you have not been audited already. The IRS does seek to audit persons who pay relatively little tax on high income so that any method of achieving this goal, including tax shelter transactions, can lead to an audit.

What happens if the IRS disagrees with counsel's tax opinion and seeks to disallow my deductions? If the IRS does this, the IRS may be reversed and in any event it can take a number of years until the appeals procedure is exhausted. During this time, you may use your tax savings profitably even if the IRS is eventually upheld. You have, at the very least, achieved a shifting of your tax burden from an earlier year to a later year. Your taxes may therefore be paid with the earnings from your tax savings or with inflated dollars that cost you far less.

Petitioner's copy of the prospectus had a number of pages missing, and other portions were crossed out and marked "outdated information, see new statement of facts." The

---

[15]None of the promotional materials which were made available to petitioner prior to his investment named any of the "major industrial companies" referred to in this context.
[16]See note 3.

missing pages contained the above-mentioned questions. No new statement of facts was contained in petitioner's copy of the prospectus.

In making his decision whether to invest in the TireSaver distributorship, petitioner did not consult an engineer or patent attorney with regard to the feasibility and viability of the TireSaver and the combination TireSaver and radar detector device. Petitioner did not make inquiries concerning: (1) The reputation and bona fides of Marco Radomile; (2) George E. Garcia, the named inventor of the TireSaver device and his claims that he was the inventor of some other, very profitable, patents; (3) the names of the "major industrial companies" from which LSI represented that it had firm offers to manufacture the TireSaver; (4) the nature and extent of the "significant general business experience" allegedly possessed by LSI's management; or (5) LSI's financial situation. Petitioner requested his attorney, Edward M. Dolson, to review the tax opinion contained in the promotional materials and to advise him whether it accurately stated the tax issues, and as to the quality of the firm which had prepared the opinion. Petitioner's attorney furnished him with copies of the résumé of Pepper, Hamilton & Sheets, as it appeared in the Martindale-Hubbell Law Directory for the year 1978. He also stated his belief that the aforesaid opinion was reliable.

In late December 1978,[17] petitioner executed the required paperwork in order to become a TireSaver distributor. Petitioner's territory was to be Johnson County, Kansas, which includes Mission Hills, Shawnee, Mission, Merriam, Overland Park, Prairie Village, Leawood, Olathe, Lenexa, and Kansas City. Kansas City, Kansas, is approximately 480 miles from Dallas, Texas, where petitioners resided.

The documents executed by petitioner included: (1) An application for TireSaver distributorship; (2) a "Distributor warranty statement to be fully completed by applicant for distributorship" (hereinafter warranty statement); (3) a "Distributor Agreement between LSI International, Inc. and Donald L. Herrick" (hereinafter distributor agreement); (4) a "Non-recourse promissory note - year 1 first note" in the amount of $147,339.97; (5) a "Non-recourse promissory note -

---

[17] Schedule C of petitioners' 1978 Federal income tax return reflects that the TireSaver distributorship was acquired on Dec. 26, 1978.

year 2 second note" in the amount of $36,834.99; (6) a "Recourse promissory note" in the amount of $17,616.74; (7) a "Security agreement"; and (8) a check payable to LSI in the amount of $36,834.99,[18] dated December 26, 1978.

The warranty statement contained a statement that petitioner acknowledged that no manufacturer had been engaged to produce the products at the price structure described in the marketing study, and that there was no guarantee that a manufacturer would be found, or even if a manufacturer was found that the products would be produced at the price structure described in the marketing study. The warranty statement also stated that petitioner was aware that the officers, directors, and shareholders of LSI would receive substantial compensation in connection with the sales of distributorships and that no amounts collected from persons such as petitioner were warranted to be used for marketing, manufacturing, or development costs relative to the TireSaver products. The warranty statement contained a statement that the applicant had independently evaluated the merits of acquiring a distributorship and was not relying on the information contained in the marketing study. The warranty statement required petitioner to certify that: (1) He anticipated "(not taking into account any income tax deductions to be realized as a distributor) taxable income for the year 1978 equal to at least twice the dollar value of the fee payable in such year upon the disposition of the rights granted by the agreement"[19] and, (2) his net worth, exclusive of personal residence and automobile, was at least $250,000. Petitioner stated, in signing the aforesaid statement, that he understood that he had the opportunity to obtain additional information— necessary to verify the accuracy of the information contained in the marketing study, the promotional brochures, and the agreement—describing the products, the marketing network, and the duties and obligations of the distributors. Petitioner elected not to avail himself of this opportunity. The warranty

---

[18]$1,601.52 of the said amount constituted payment of promotional funds to be deposited to a special account and remitted to petitioner for any and all purposes relevant to the promotion and sale of the products upon receipt of petitioners' proposal by LSI, according to the terms of the distributor agreement.

[19]See note 10 *supra*.

statement was accepted, on December 30, 1978, by Marco Radomile on behalf of LSI.

The distributor agreement stated that it was effective as of November 1, 1978. Under the aforesaid agreement, petitioner was granted the exclusive right to sell, promote, and otherwise distribute TireSaver products—the TireSaver tire pressure monitoring system and the combination TireSaver and radar detection system—in Johnson County, Kansas. The rights granted were limited by the distributor agreement to the retro market.[20] The term of the distributor agreement was to be for 20 years, with the possibility of a 10-year extension, provided the parties thereto mutually agreed. In consideration of the distribution rights to the TireSaver tire pressure monitoring system, petitioner was to pay LSI an acquisition fee by check. In addition to the acquisition fee, the distributor was to pay unit royalties for every TireSaver tire pressure monitoring system or combination tire pressure monitoring system and radar detection device sold.

Should petitioner wish to license the exclusive right to sell the *combination* TireSaver and radar detection system, an additional annual use fee was to be paid on the first day of the year to which it applied. For years 1, and 3 to 7, the annual use fee was to be paid by means of a nonrecourse, interest-bearing (at 10-percent annual rate), 15-year term note. In year 2, two-thirds of the annual use fee was to be paid by nonrecourse note. Interest and principal on the aforesaid notes was to be payable from 40 percent of the gross profits generated by the TireSaver and the combination TireSaver and radar detection system.

In addition to any other royalties, acquisition, or annual use fees, petitioner was to pay LSI a royalty equal to 8 percent of the gross sale income from the sale of the tire pressure monitoring device and 4 percent of the gross sale income from the sale of any other products licensed for sale by the distributor, within 30 days of the receipt of the sales proceeds. Petitioner was further required by the agreement to pay LSI promotional funds which were to be deposited to a special, separate account, and remitted to petitioner for any purposes

---

[20]Defined as sales to purchasers who did not intend to install the devices as original equipment on newly manufactured vehicles, or replacement use of the devices. Also excluded were the right to sell to the United States or any of its agencies, to any foreign government, and the export business.

relevant to the promotion and sale of products covered by the agreement upon receipt of a signed proposal for the use of such funds by LSI. The distributor agreement stated that:

neither the Company [LSI] nor the manufacturer shall be under any obligation to the Distributor to manufacture, sell, or supply or to continue to manufacture, sell, or supply any of the Products, and no warranty of any nature as to any of the Products shall run from the Company [LSI] or the Manufacturer to the Distributor, at any specified price or prices except as may be agreed between the parties hereto from time to time.

The distributor agreement signed by petitioner further stated:

The Distributor hereby covenants and agrees to indemnify the Company [LSI] and the Manufacturer and hold them harmless for any and all actions, causes of action, claims, costs, expenses, attorneys' fees, suits, judgments, fines, administrative or regulatory agency action, settlements or any other liabilities, losses or damages, that the Company or the Manufacturer may suffer or incur, arising out of or in any way related to the formation and organization of the Distributor, the acquisition of the distributorship rights granted hereby, the formation and organization of any assignee or transferee of any of the rights granted hereby, the transfer of any of the rights granted hereby to any third party for the purpose of marketing the Products on behalf of the Distributor and the compliance of the foregoing with appropriate federal or state securities, franchise, or other applicable law. * * *

The aforesaid agreement also stated that if a product were no longer available, the agreement was cancelable or alterable at the sole discretion of LSI. The distributor agreement was signed by Marco Radomile, on behalf of LSI, and by petitioner.

Petitioner signed a "Non-recourse promissory note - year 1 first note," pre-dated November 1, 1978. The said note provided that petitioner promised to pay to the order of LSI the sum of $147,339.97, together with annual interest thereon at the rate of 10 percent from November 1, 1978, to November 1, 1994. Petitioner was not personally liable for payment of this note. The note represented payment of the annual use fee for 1978. Petitioner also executed an undated nonrecourse 15-year promissory note for $36,834.99, representing two-thirds of the annual use fee for 1979. Petitioner assumed no personal liability for the payment of this note. The note was secured by a security interest in petitioner's rights under the distributor agreement. The aforesaid nonrecourse notes incorporated the

distributor agreement by reference, which required that prior to the due date of the said notes, interest and principal on the notes would be payable currently from 40 percent of the gross profits, viz, total receipts less amounts paid LSI (except for "annual use fee"), from the sales of the TireSaver, the combination TireSaver and radar system, and components thereof. In addition, petitioner signed a recourse promissory note for $17,616.74, representing one-third of the annual use fee for 1979, pre-dated December 15, 1978.[21]

Sometime prior to the due date of petitioners' Federal income tax return for the taxable year 1978, Donald received a letter from LSI containing a model Schedule C, Profit or Loss from Business or Profession, demonstrating how to claim deductions in connection with the distributorship activity. The aforesaid model Schedule C indicated that the accrual method of accounting had been elected in connection with the TireSaver activity, that a method of valuing inventory had not been selected or was inapplicable, and that the distributorship was acquired on December 29, 1978.

Petitioners received a letter from LSI, dated November 15, 1979, informing him that there were serious problems with the transceiver component of the TireSaver. The letter also stated that:

Before LSI will be in a position to deliver commercial quantities of TireSaver, LSI must, among other things, further solve problems under the arrangement with its licensor relating to the TireSaver patents. In addition, LSI's cash position is such that it believes that its resources are best utilized developing the TireSaver System and consequently does not presently expect to be able to pursue the cruise control, radar device or other projects of its subsidiary A.E.C.

Pending satisfactory answers to the above questions, *LSI is declining to accept payments for [sic] distributors, whether payments of prior recourse or non-recourse notes, or delivery of additional notes and payments of annual use fees.* [Emphasis added.]

---

[21]The recourse note was payable in installments as follows:

| Due date | Installment |
| --- | --- |
| Mar. 15, 1979 | $4,844.60 |
| June 15, 1979 | 4,734.50 |
| Sept. 15, 1979 | 4,624.39 |
| Dec. 15, 1979 | 4,514.29 |

The record contains no evidence of payment of the marketing and promotional expense in the amount of $800.76, which was supposed to be paid for 1979.

Petitioner received a letter, dated January 25, 1980, stating that LSI was accepting offers for radar detector devices at a cost to the distributor of $129 per unit. On or about February 12, 1980, petitioner ordered a radar detection device from LSI.[22]

LSI sent a letter to petitioner, dated February 15, 1980, which stated as follows, with regard to the TireSaver tire pressure monitoring system:

There is no way to tell how long road testing will take. Once it is begun, *if the road testing is successful and a commercially viable product can be produced, LSI will at that time consider the acceptance of note payments.* [Emphasis added.]

Petitioner received a letter, dated November 20, 1980, stating that LSI was negotiating with Tiretronics Japan Co., Ltd., for the manufacture of the TireSaver and the combination TireSaver and radar detector device. The estimated cost to the distributors was to be between $60 and $80 for the TireSaver and between $185 and $205 for the TireSaver and radar detector system combination. On or about December 7, 1980, petitioner ordered one TireSaver tire pressure monitoring device and one combination TireSaver and radar detector device from LSI.[23]

Petitioner subsequently received a letter, dated March 25, 1981, from LSI stating that pre-production TireSaver units were to be available as of late April 1981, and that said units would cost the distributor $275 per unit. The TireSaver compatible radar detection device was to cost an additional $129 per unit. Petitioner sent a letter to LSI, dated April 8, 1981, ordering the TireSaver and the radar detection device and authorizing LSI to deduct $404 from the $1,601.52 being held in escrow by it as promotional funds.

A letter from LSI, dated May 4, 1981, notified petitioner that LSI had executed an exclusive distributorship agreement with Tiretronics Japan Co., Ltd., and that pre-production units of the TireSaver and the combination TireSaver and radar detection device would be available by June 1981 at an approximate cost of $100 for the TireSaver and an additional

---

[22]The record does not contain canceled checks, money orders, or any evidence reflecting payment for the TireSaver products.

[23]See note 22.

$135 for the units with radar. The letter also stated that payment on the recourse note for the second year's (1979) use fee was being requested, and gave the distributors the option to apply the amounts held by LSI in escrow, as promotional funds, toward the amount owing on the recourse notes. Petitioner executed a statement reflecting that the amount due on the recourse note was $17,616.74, and that he consented to application of the $1,601.52 of promotional funds against the amount due on the recourse note.

Petitioner was notified, by letter dated May 8, 1981, of additional problems in connection with the TireSaver products, and that there would be further delays in manufacturing any radar detection device.

The TireSaver design was not viable, and was unmarketable and essentially worthless without substantial modification.[24] The rights to distribute the TireSaver and the combination TireSaver and radar detector device thus were also worthless.

As of the date of trial, petitioner had made no payments of principal or interest toward the notes, recourse or nonrecourse, nor had he sold any TireSaver devices. LSI did not take any legal action, nor did it make any demand of payment in connection with the recourse or nonrecourse notes. Petitioner never received a functional, workable, marketable product. Petitioner did not maintain a separate bank account with respect to the TireSaver distributorship.

Petitioners claimed a $150,863.77 loss from the distributorship activity on Schedule C, Profit or (Loss) From Business or

---

[24]The record contains substantial evidence submitted by respondent, through an instrumentation engineer and an electrical engineer whom we consider qualified, concerning the TireSaver technology and patents.

The design of the tire pressure monitor had many serious defects including: (1) Problems with locating and aiming the radio frequency transmitter and receiver so that a Doppler signal—"a change in the frequency with which waves (as sound, light, or radio waves) from a given source reach an observer when the source and the observer are in rapid motion with respect to each other so that the frequency increases or decreases according to the speed at which the distance is decreasing or increasing" (Webster's Ninth New Collegiate Dictionary (1984))— would not be reflected off the wheel rims, the steel belts in radial tires, or snow chains; (2) problems with locating and aiming the radio frequency transmitter and receiver to avoid a Doppler signal being reflected off the aforesaid items as a result of the movement of the front tires of the automobile through turning or bumps; (3) problems with locating and aiming the radio frequency transmitter and receiver in such a manner that there would not be a Doppler signal reflected as a result of load factors in the automobile; (4) problems with the reference chamber inside the tire caused by bumps and heat; (5) problems with the inlet valve on the reference chamber as a result of leakage caused by weak pressure differential, vibration, pollution of its environment by moisture, dust particles, and other contaminates; and (6) problems with the outlet valve.

Profession, of their 1978 income tax return.[25] Petitioners had taxable income, not taking into account the claimed $150,863.77 loss from the TireSaver distributorship, of $178,287.91,[26] in 1978. Petitioners elected the accrual method of accounting with respect to the TireSaver distributorship activity;[27] petitioners also noted that a method of valuing inventory had not been selected or was inapplicable as had been previously indicated to them by LSI. On Schedule C of their income tax return for the taxable year ended December 31, 1979, petitioners claimed a loss from the TireSaver distributorship in the amount of $33,316.[28] Petitioners had taxable income, not taking into account the claimed $33,316 loss, in the amount of $86,952.42, in 1979.

Respondent disallowed all the losses claimed by petitioners on their Federal income tax return for taxable years 1978 and 1979 on a variety of grounds (see discussion *infra*).

---

[25]Computed as follows:

| Item | Amount |
| --- | --- |
| Total income | 0 |
| Depreciation | $3,523.80 |
| Distributor use fee | 147,339.97 |
| | 150,863.77 |

The depreciation deduction apparently represents one-tenth of the "acquisition fee" of $35,233.47. However, one-tenth of $35,233.47 is $3,523.35 and not $3,523.80, as claimed by petitioners.

The $147,339.97 represents the annual use fee for 1978, covered by a nonrecourse note.

[26]Including a $44,529.96 net capital gain resulting from transactions which were completed prior to the end of February 1978.

[27]Petitioners elected the cash method of accounting with respect to petitioner's financial consulting activity.

[28]Computed as follows:

| Item | Amount |
| --- | --- |
| Total income | 0 |
| Depreciation | ($3,524) |
| Interest on business indebtedness | (16,496) |
| Distributor use fee | (13,296) |
| Claimed loss | (33,316) |

Petitioners deducted $3,524 as depreciation, however, one-tenth of $35,233.47 is $3,523.35 and not $3,524, as claimed by petitioners. The interest deduction in the amount of $16,496 represents interest on the $147,339.97 nonrecourse note and the $17,616.74 recourse note. The computation is as follows: $147,339.97 plus $17,616.74 equals $164,956.71, multiplied by 10 percent is $16,495.67; rounded to the nearest dollar.

It is unclear how the deduction in the amount of $13,296 for the distributor use fee was computed, although it may have been the result of petitioners' return preparer's interpretation of the application of the at-risk provisions of sec. 465.

OPINION

The ultimate issue to be decided is whether petitioners are entitled to deduct claimed losses resulting from Donald's investment in a TireSaver distributorship.[29]

Respondent advances a wide array of arguments in support of his disallowance of the deductions claimed by petitioners. Respondent's primary contention is that the TireSaver distributorship losses were incurred in an activity not engaged in for profit, and therefore, petitioners are not entitled to deduct depreciation or amortization expenses in connection with the acquisition fee for 1978, annual use fees for 1978 and 1979, and interest expense for 1979, under sections 162 and 1253(d). Alternative arguments advanced by respondent include the following: (1) The nonrecourse notes delivered as payment of the annual use fee for 1978, in the amount of $147,339.97, and partial payment of the annual use fee for 1979, in the amount of $36,834.99, were contingent, speculative, and should not be recognized for Federal income tax purposes; (2) the above-mentioned nonrecourse notes should not be recognized for income tax purposes as the fair market value of the property securing the notes does not even approximate their face amount; (3) the aforementioned nonrecourse notes do not constitute bona fide liabilities which will permit the accrual of interest deductions; (4) the recourse note in the amount of $17,616.74, given by petitioner as partial payment of the annual use fee for 1979, does not support the accrual of a deduction for 1979, since LSI (the payee) made payment of the note conditional upon successful development of a product; (5) no interest was properly accruable for 1979 in connection with the above-mentioned recourse note as interest was also conditional on the development of a viable product; and (6) payments under section 1253(d) must run the gauntlet of section 162 in order to be deductible.

Section 183(a)[30] provides that if an individual's activity

---

[29]See notes 25 & 28 *supra*.

[30]Sec. 183 provided, in pertinent part, as follows, during the years in issue:

SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT.

(a) GENERAL RULE.—In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

constitutes an activity "not engaged in for profit," the deductions arising out of such activity shall not be allowed except as provided in section 183(b). An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." If the activity is not engaged in for profit, section 183(b) separates the claimed deductions into two groups. Section 183(b)(1) allows only those deductions which are not dependent upon a profit motive, e.g., interest and taxes. Section 183(b)(2) allows the balance of the deductions which would otherwise be permitted only if the activity was engaged in for profit, but only to the extent that the gross income derived from the activity exceeds the deductions allowed under section 183(b)(1).

Section 1253(d)(1)[31] provides that amounts paid or incurred during the taxable year on account of a transfer of a franchise which are contingent on the use of the transferred franchise shall be allowed as a deduction under section 162(a).

Section 162(a) allows as a deduction all the necessary and ordinary expenses paid or incurred during the taxable year in carrying on any trade or business. In order to constitute the carrying on of a trade or business under section 162, an activity must "be entered into, in good faith, with the dominant hope and intent of realizing a profit therefrom." *Hirsch v. Commissioner*, 315 F.2d 731 (9th Cir. 1963), affg. a Memoran-

---

(b) Deductions Allowable.—In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed—

(1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

(2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

(c) Activity Not Engaged in for Profit Defined.—For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

[31]Sec. 1253(d)(1) provided as follows during the years in issue:

SEC. 1253(d). Treatment of Payments by Transferee.—

(1) Contingent Payments.—Amounts paid or incurred during the taxable year on account of a transfer, sale, or other disposition of a franchise, trademark, or trade name which are contingent on the productivity, use, or disposition of the franchise, trademark, or trade name transferred shall be allowed as a deduction under section 162(a) (relating to trade or business expenses).

dum Opinion of this Court; *Dreicer v. Commissioner*, 78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). See also *Brannen v. Commissioner*, 722 F.2d 695 (11th Cir. 1984), affg. 78 T.C. 471 (1982); *Hager v. Commissioner*, 76 T.C. 759 (1981), and cases cited therein. "Profit," in this context, means economic profit, independent of tax savings. *Surloff v. Commissioner*, 81 T.C. 210 (1983).

The issue of whether a taxpayer engages in an activity with the requisite intention of making a profit is one of fact to be resolved on the basis of all the surrounding facts and circumstances. Sec. 1.183–2(b), Income Tax Regs.; *Engdahl v. Commissioner*, 72 T.C. 659 (1979); *Allen v. Commissioner*, 72 T.C. 28 (1979). In determining whether an activity is engaged in for profit, the following factors are to be considered: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183–2(b), Income Tax Regs.; *Boyer v. Commissioner*, 69 T.C. 521 (1977); *Benz v. Commissioner*, 63 T.C. 375 (1974). It is not intended, however, that only the aforesaid factors be taken into account in making the determination. Sec. 1.183–2(b), Income Tax Regs.

Respondent's determination is presumptively correct. *Welch v. Helvering*, 290 U.S. 111 (1933). The burden of proving the requisite profit objective is on the taxpayer. Rule 142(a).

From a close examination of the record as a whole we are satisfied and so find that the TireSaver activity was not an activity engaged in for profit. Rather, we are convinced that petitioner engaged in the TireSaver activity primarily, if not exclusively, in order to obtain the tax advantages offered in the prospectus or promotional materials.

Prior to becoming a financial consultant, petitioner had been an insurance salesman and broker; petitioner had also invested in oil and gas and real estate ventures. Other than presumably owning automobiles, petitioner had no knowledge

or experience in connection with the design, manufacture, marketing, or sale of automotive parts. By his own admission, petitioner lacked any mechanical abilities. We do not think, and petitioners do not argue to the contrary, that petitioner's experience in selling insurance or in investing in real estate or oil and gas ventures translated into expertise in the automotive parts marketing business. In evaluating the opportunity of investing in a TireSaver distributorship, however, petitioner did not seek to inform his conceded ignorance on these matters. No inquiries were made by petitioner regarding the bona fides and qualifications of LSI's management, George E. Garcia, the named inventor of the TireSaver device, and his claims that he was the inventor of some other very profitable patents,[32] the names of the "major industrial companies" from which LSI represented that it had firm offers to manufacture the TireSaver, or the feasibility and viability of the TireSaver device. Petitioner did not give importance to the fact that no prototypes or pre-production models of the TireSaver were available in late 1978 when petitioner signed the required paper work to become a TireSaver distributor, even though claims were being made by LSI that a functional, viable product would be available to be marketed in early 1979 and, presumably, the success of the distributorship activity was dependent upon the availability of such product. Petitioner did not inquire as to the reason why the prospectus had crossed out portions and missing pages. Petitioner did not take into account the operating expenses of the distributorship's office and activities—rent, supplies, stenographic and clerical assistance, salesmen and representatives' salaries and commissions, telephone costs, telegrams, agency licenses and taxes, automobile and other insurance, and the like—not allowed for in the marketing study.[33] Failure to make such elementary inquiries and to obtain expert advice in a transaction of the magnitude of this one is not consistent with ordinary sound business practice, and may be regarded as evidence that petitioners lacked a profit motive. See *Flowers v. Commissioner*, 80 T.C. 914 (1983); *Surloff v. Commissioner*, 81 T.C. 210 (1983).

---

[32]See note 14.

[33]Pursuant to sec. 4.10 of the distributor agreement, the distributor was solely responsible for the payment of these expenses.

Concededly, a taxpayer's expectation of profit need not be reasonable. *Dreicer v. Commissioner, supra.* We are not required, however, to ignore petitioner's selectivity in evaluating the transaction herein. The facts and circumstances must indicate that the taxpayer had the requisite profit objective. *Dreicer v. Commissioner, supra.* Petitioner was provided with the opportunity of obtaining additional information necessary to verify the accuracy of the information contained in the marketing study, the promotional brochures, and the agreement, describing the products, the marketing network, and the duties and obligations of the distributors, as stated in the warranty statement; he elected not to avail himself of it. Petitioner did seek, however, his attorney's opinion as to the correctness of the tax opinion contained in the promotional materials, and his opinion of the firm rendering the tax opinion. Petitioner's attorney supplied him with a copy of the said firm's résumé contained in the Martindale-Hubbell Law Directory. Although petitioner testified that prior to his decision to invest in the TireSaver distributorship, he met with other purchasers of distributorships, with territories adjacent to the territories that he was considering, to discuss marketing strategies, his failure to present their testimony to corroborate such claims permits us to draw the inference that their testimony would not be supportive of petitioner's contention. *Wichita Terminal Elevator Co. v. Commissioner*, 162 F.2d 513 (10th Cir. 1947.[34]

Petitioner did not open a bank account for the distributorship activity, nor did he make arrangements to find a warehouse for the TireSaver products, nor hire any employees.[35] Petitioners argue that Donald was ready to perform all the aforesaid activities as soon as he had a product to sell. Greater weight should be given, however, to objective facts than to mere statements of intent. *Dreicer v. Commissioner, supra.* Petitioner would have us find that he honestly believed, in making the investment in issue herein, that a feasible, marketable TireSaver product was to be delivered to him in early 1979, yet he took no steps to insure that he would have a place to store the products, the rights to distribute which were

---

[34]See also *Jameson v. Commissioner*, T.C. Memo. 1985-262.

[35]Petitioners resided 480 miles from Johnson County, Kansas, his territory. In addition, petitioner was a financial consultant and chief executive officer or general partner of 22 entities.

to cost him at least $239,427.45, according to the paperwork executed by him.[36]

The record also indicates a history of substantial deductions attributable to the yearend investment in the TireSaver distributorship,[37] which were offset against petitioner's substantial income from other sources, but no gross receipts, thus enabling petitioner to claim $4 in deductions for every $1 of cash investment in 1978.[38]

Petitioners have failed to carry their burden of proving a primary profit motive in engaging in the TireSaver activity. They are not entitled to business deductions under sections 162 and 1253(d)(1) with respect to the annual use fees for the years 1978 and 1979.

We now turn to section 183 to determine the amount, if any, of the deductions which are allowable under section 183(b)(1). Specifically, this issue is limited to the $16,496 of interest deducted by petitioners for 1979.[39]

Section 163(a) allows a deduction for "all interest paid or accrued within the taxable year on indebtedness." Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. Sec. 1.461–1(a)(2), Income Tax Regs.; *United States v. Anderson*, 269 U.S. 422 (1926). The proper accrual of the interest expense is in turn dependent upon the proper accrual and bona fides of the underlying indebtedness.

The annual use fee was payable, pursuant to section 3.03 of the distributor agreement, for any year during the term of the

---

[36]The addition of the acquisition fee ($35,233.47), marketing and promotional expense for 1978 ($1,601.52), nonrecourse note for 1978 use fee ($147,339.97), marketing and promotional expense for 1979 ($800.76), nonrecourse note portion of use fee for 1979 ($36,834.99), and recourse portion of annual use fee for 1979 ($17,616.74) equals $239,427.45.

[37]See note 17.

[38]The amount of the nonrecourse note, representing payment of the annual use fee for 1978 is four times the cash investment for 1978, as follows: (acquisition fee $35,233) plus marketing and promotional expense for 1978 ($1,601.52), multiplied by 400 percent equals $147,339.96. Petitioners' goal of achieving 300 percent worth of deductions for every dollar invested in 1979 was, to a certain extent, frustrated by petitioners' return preparer's interpretation of the at-risk provisions of sec. 465. We note that no payments were made on the recourse note during 1979 and 1980. See note 42.

[39]Presumably, the $16,496 deduction represents interest on the $147,339.97 nonrecourse and the $17,616.74 recourse notes, as follows: $147,339.97 plus $17,616.74 equals $164,956.71, multiplied by 10-percent interest rate equals $16,495.67; rounded to the nearest number. No interest deduction was claimed with respect to the $36,834.99 nonrecourse note.

agreement, in consideration for the exclusive right to sell the combination TireSaver and radar detection system. Given LSI's failure to produce a viable product, the use of the distributorship for the sale of the dual purpose system was impracticable, and petitioner's election to distribute the dual purpose system—predicated upon the assumption that the patented system and the dual purpose system were operational, that a contract for their manufacture was to be agreed upon soon, and that the systems were to be available so that it would be possible to solicit orders no later than early 1979—was futile; thus no obligation to pay the annual use fees arose.

With regard to the nonrecourse note,[40] the distributor agreement provided that the interest and principal on such note was to be payable only from 40 percent of the gross profits—defined as the selling price of the products sold by the distributor, reduced by the unit royalties—generated by the TireSaver and the dual purpose system. No gross profits were generated as no TireSaver products were ever manufactured.[41]

In addition, petitioner received a letter from LSI, dated November 15, 1979, stating that LSI was declining to accept payments of the annual use fees, represented *by the recourse and nonrecourse notes*, pending satisfactory resolution of the problems inherent to the development of the TireSaver system.[42] It was petitioner's intention that the notes would not be paid until a viable product was furnished by LSI. Petitioner testified as follows:

I did not even pay the first quarter [on the recourse note], because I felt that they should have had a product there by that time and Marco [Radomile] said he was going to sue me for not paying the note. And I said go ahead.[43] We will—because *when you get me a product* I will pay the note, but in the

---

[40]Apparently, petitioners did not take any deductions with respect to the nonrecourse note, in the amount of $36,834.99, given as partial payment of the annual use fee for 1979.

[41]Petitioner testified that he had received a radar detection device from LSI which lacked tire pressure monitoring capability. According to petitioner, the wholesale price for the device was in excess of the retail price for competitive devices and, thus the device was worthless from a retail marketing standpoint. Petitioner testified, further, that he received a tire pressure monitoring device in 1980 which did not work. Petitioner's testimony that he received a radar device in 1979 and a tire pressure monitoring device in 1980, is inconsistent with the correspondence from LSI presented by petitioners.

[42]As of Nov. 15, 1979, three of the four payments on the $17,616.74 recourse note were due, and unpaid.

[43]There is no evidence that LSI instituted any legal action or made any demands for payment with respect to the recourse or nonrecourse notes.

meantime, *I am not giving you another cent until I get a product.*[44] [Emphasis added.]

It is well established that in order for a liability to be accruable, it must be binding and enforceable; must not be contingent on a future event; the amount of the liability must be certain; and there must be a reasonable belief on the part of the debtor that the liability will be paid. *Putoma Corp. v. Commissioner*, 66 T.C. 652 (1976), affd. 601 F.2d 734 (5th Cir. 1979); *United Control Corp. v. Commissioner*, 38 T.C. 957 (1962). We are satisfied that the notes herein at issue do not satisfy the aforesaid requirements and that the annual use fees and the interest on the notes given as "payment" are not deductible for the years in issue, as they were improperly accrued.

Furthermore, petitioners have failed to prove that the purchase price and the principal amount of the nonrecourse note did not unreasonably exceed the value of the distributorship. It is well settled law that in order for an interest deduction to be allowable, the indebtedness must be genuine. See *Hager v. Commissioner*, 76 T.C. 759 (1981). If the purchase price and the principal amount of the notes unreasonably exceed the value of the property to be purchased, then no genuine indebtedness exists.[45] *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *Hager v. Commissioner, supra.*

---

[44]Petitioners introduced in evidence a letter from LSI, dated May 4, 1981, stating that LSI had entered into an "exclusive distributorship agreement" with a Japanese company, and that the next payment on the recourse note for the second year's (1979) use fee was now being requested. The letter also stated that those distributors with amounts in escrow for promotional purposes could elect to have LSI apply the balance in that account towards payment on the note. Petitioner executed an undated statement reflecting that the amount due on the recourse note was $17,616.74, the principal amount of the note, and that he consented to the application of the promotional funds in the amount of $1,601.52 held in escrow by LSI, against the note. We note, however, that the record contains another letter from petitioner to Marco Radomile, as president of LSI, dated Apr. 8, 1981, in which petitioner authorized the transfer to $404 out of the promotional funds account to pay for pre-production TireSaver and combination TireSaver and radar detection system units.

[45]In *Brannen v. Commissioner*, 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984), this Court stated that the test was whether the stated purchase price unreasonably exceeded the value of the property, whereas in *Hager v. Commissioner*, 76 T.C. 759 (1981), this Court stated that the test was whether the principal amount of the nonrecourse indebtedness unreasonably exceeded the value of the property. We need not decide that issue here because both the purchase price and the principal amount of the note far exceed the value of the TireSaver distributorship and other attendant rights acquired by petitioner.

Petitioners contend, however, that *Tufts v. Commissioner*, 461 U.S. 300 (1983), requires that, irrespective of market value of the property, respondent is required to recognize the principal amount of the nonrecourse obligation and the interest payable thereon as a deductible expense. Our analysis and understanding of *Tufts v. Commissioner, supra*, is to the contrary.

*Tufts v. Commissioner, supra*, dealt with an issue which was suggested, but not resolved, by *Crane v. Commissioner*, 331 U.S. 1 (1947).[46] *Crane v. Commissioner, supra*, held that a taxpayer who sold property encumbered by a nonrecourse mortgage, the principal amount of which was less than the value of the property, must include the unpaid balance of the mortgage in the computation of the amount the taxpayer realized on the sale. *Tufts* held that the same rule applies when the unpaid amount of the nonrecourse mortgage exceeds the fair market value of the property at the time of the sale.

In *Tufts v. Commissioner, supra*, a partnership financed the construction of an apartment complex by a nonrecourse mortgage in the amount of $1,851,500. The mortgage was extended by an institutional lender, and it was Government-insured. From all that appears, the principal amount of the mortgage did not exceed the fair market value of the complex when it was completed. For 2 years after completion, all partners claimed, as income tax deductions, their allocable shares of losses and depreciation computed on a basis which included the principal amount of the nonrecourse mortgage. Shortly after completion of the complex, rental income decreased below expectations as a result of adverse economic conditions in the area, and the mortgage became in default. Each partner then sold his interest in the property to a third party for a nominal amount, plus assumption by the third party of the nonrecourse mortgage. On the date of transfer of ownership, the partnership's adjusted basis in the property was $1,455,740, and the property's fair market value did not exceed $1,400,000. Each partner claimed as a tax loss his share of the difference between the selling price and the fair market value of the property ($55,740). The Commissioner, however, took the position that each partner had realized a gain because

---

[46]See 331 U.S. 14, n. 37.

the partnership had realized the full amount of the nonrecourse obligation. The Supreme Court sustained the Commissioner's position.

It reasoned that in light of the Commissioner's long-standing policy, approved in *Crane*, of treating a nonrecourse mortgage "in this context as a true loan," 461 U.S. at 307, with the result that a taxpayer may realize the benefit of depreciation on a purchase financed by nonrecourse debt, it was not unreasonable for the Commissioner to treat the assumption of the nonrecourse debt as part of the selling price in determining the amount realized by a taxpayer upon disposition of the encumbered property even when the unpaid amount of the nonrecourse obligation exceeds the value of the property transferred. The Court's rationale was thus essentially one of symmetry, the concept that if a tax benefit is claimed and allowed from debts incurred under nonrecourse obligations, the taxpayer must treat the transfer of these obligations as part of the consideration for a sale of the property. [*Odend'hal v. Commissioner*, 748 F.2d 908 (4th Cir. 1984), affg. 80 T.C. 588 (1983), cert. denied 471 U.S. ____ (1985).]

There is nothing in *Tufts* to require that the nonrecourse debt in the instant case must be recognized. This is not a case where, having taken depreciation on property on a basis which includes nonrecourse debt incurred in acquisition of the property, a taxpayer seeks to ignore a transfer of the nonrecourse note in computing gain or loss from a subsequent sale of the property.

In addressing an argument similar to the one raised by petitioners, the Court of Appeals for the Fourth Circuit stated:

We see nothing in Tufts to alter the well-established rules that a taxpayer may not * * * claim an interest deduction where he has neither personal liability nor economic incentive to pay. In reaching these conclusions, we note that while *Tufts* did state that "Crane also stands for the broader proposition * * * that a nonrecourse loan shall be treated as a true loan," 461 U.S. at 313, 103 S. Ct. at 1834, it emphasized that *Crane* was "predicated on the assumption that the mortgage will be repaid in full," i.d. 103 S. Ct. at 1836, and that "the original inclusion of the amount of the mortgage in basis rested on the assumption that the mortgagor incurred an obligation to repay." [*Odend'hal v. Commissioner*, 748 F.2d at 913.]

The assumption that the nonrecourse note would be repaid is lacking herein. Petitioners had no economic incentive to repay the said obligation. It follows that petitioners are not entitled to deduct any interest with regard to the nonrecourse note.[47]

---

[47]Sec. 183(b)(1) requires an independent determination of allowability with respect to the interest expense.

Petitioners argue, citing *Natco Corp. v. United States*, 240 F.2d 398 (3d Cir. 1956), that where, as in here, the notes provide for payment no later than on a certain date, no contingency exists, and the notes, along with their accompanying interest expense, are deductible. Concededly, the nonrecourse note provided that all unpaid interest and principal was to be due and payable on the 15th anniversary date of the note's execution, and the recourse note was to be paid in installments.[48] However, we do not think, and *Natco Corp. v. United States, supra*, does not support the proposition, that the inclusion of a clause providing that payment of principal and interest is to be made by a certain date causes the disappearance of all contingencies, and guarantees, ipso facto, the accruability of principal and interest.

In *Natco Corp. v. United States, supra*, a corporation, reorganized under the bankruptcy laws, issued debentures to its creditors and proceeded to accrue the unpaid interest on the debentures and to deduct it as an expense for tax purposes. All of the accumulated and current interest was paid; the returns showed no deduction for payment of the accumulated interest, but only for current interest. The taxpayer instituted a proceeding to obtain refund of income taxes, claiming that the accruals were improper and that the deductions should have been taken only in the years of payment. In affirming the District Court's determination that the accruals and deductions in the years prior to payment had been proper for the reason that the debentures and indenture accompanying them had created a definite and fixed liability of the taxpayer for interest, the Court of Appeals for the Third Circuit reasoned that: (1) The provision in the debentures and the indenture that payment of the interest semiannually was to constitute a fixed obligation of the company only after the first mortgage bonds had been retired was intended to defer such payment until that date and not to make the obligation of the company for interest at maturity contingent upon that event; (2) the corporation could redeem the debentures at any time but only upon the payment of the principal and accrued interest to the date of redemption, together with a premium of 5 percent of the principal; (3) upon conversion, the debenture holders were

---

[48]See note 21.

entitled to receive an additional share of stock for each $20 of unpaid accrued interest; (4) the conduct of the taxpayer from the date of the issuance of the debentures clearly indicated that the interest on the debentures was regarded as a fixed liability; and (5) the contingency of payment upon earnings was in turn qualified by the provisions in the debentures and in the indenture that payments of principal and interest were to be made on the maturity date. Thus, this last factor was but one of several factors that were considered by the court in reaching its determination. Likewise, in making our determination, we have considered several factors, with no single one of them being determinative.

Section 1253(d)(2) prescribes the tax treatment for payments, other than contingent payments within the meaning of section 1253(d)(1), made by transferees of a franchise, where the transfer is not treated as a sale or exchange of capital asset, in discharge of a principal sum agreed upon in the transfer agreement.[49] Section 1253(d)(2)(A) provides that a single payment made in discharge of such principal sum shall be allowed as a deduction ratably over the taxable years in the period beginning with the taxable year in which the payment is made and ending with the shorter of the ninth succeeding taxable year or the last taxable year beginning in the period of the transfer agreement.

Petitioners contend that, pursuant to section 1253(d)(2)(A), they are entitled to amortize and deduct the $35,233.47 paid as an acquisition fee in connection with the TireSaver distributorship, ratably, over a 10-year period, beginning with the year

---

[49]Sec. 1253(d)(2) provided as follows during the years in issue:

(2) OTHER PAYMENTS.—If a transfer of a franchise, trademark, or trade name is not (by reason of the application of subsection (a)) treated as a sale or exchange of a capital asset, any payment not described in paragraph (1) which is made in discharge of a principal sum agreed upon in the transfer agreement shall be allowed as a deduction—

  (A) in the case of a single payment made in discharge of such principal sum, ratably over the taxable years in the period beginning with the taxable year in which the payment is made and ending with the ninth succeeding taxable year or ending with the last taxable year beginning in the period of the transfer agreement, whichever period is shorter;

  (B) in the case of a payment which is one of a series of approximately equal payments made in discharge of such principal sum, which are payable over—

    (i) the period of the transfer agreement, or

    (ii) a period of more than 10 taxable years, whether ending before or after the end of the period of the transfer agreement,

  in the taxable year in which the payment is made; and

  (C) in the case of any other payment, in the taxable year or years specified in regulations prescribed by the Secretary, consistently with the preceding provisions of this paragraph.

1978, without regard to the requirements of section 162.[50]

Respondent contends that the payment herein must run the gauntlet of section 162(a). Alternatively, respondent argues that if petitioners are entitled to an amortization deduction with regard to the acquisition fee, the amount allowable is an amount which bears the same ratio to the amount claimed as the portion of the year that the distributorship rights were actually held bears to a full year.

Section 1253(d)(1) specifically provides that amounts paid or incurred as therein described "shall be allowed as a deduction under section 162(a) (relating to trade or business expenses)." Section 1253(d)(2) does not contain a reference to section 162, or to any other section of the Code. Petitioners argue that this is demonstrative of Congress' intent that section 162 be inapplicable to section 1253(d)(2) payments.

The House report, in explaining the provisions of section 1253, states:

The term "franchise" is defined by the bill to mean a franchise, distributorship, or other like interest. This would include subfranchises, subdistributorships, and other similar exclusive type contract arrangements *to operate or conduct a trade or business.* [H. Rept. 91–413 (1969), 1969–3 C.B. 200, 302; emphasis added.]

The Senate report provides:

The committee amendments also provide that the term "franchise" includes an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area. This would include distributorships or other similar exclusive-type contract arrangements to *operate or conduct a trade or business* within a specified area, such as a geographical area to which the *business activity of the transferee* is limited by the agreement. However, the committee amendments provide that the new rules are not to apply to the transfer of a franchise to engage in a professional sport. This exception applies only to franchises for teams to participate in a professional sports league, and would not apply to other franchised sports enterprises, such as a franchise to operate a golfing, bowling, or other sporting enterprise *as a trade or business.* * * * [S. Rept. 91–552 (1969), 1969–3 C.B. 423, 557; emphasis added.]

---

[50]The next logical step in petitioners' argument is that our determination that the TireSaver activity was not engaged in for profit, as no deductions under sec. 162 are allowable, does not preclude the deduction of amortization or depreciation expenses in connection with the acquisition fee, $35,233.47, paid for the TireSaver distributorship.

Prior to the enactment of section 1253(d)(2), amounts paid as initial fees to acquire a franchise were not deductible by the transferee through depreciation or amortization since franchises were considered to be intangible assets with unascertainable useful lives. See S. Rept. 91–552, *supra* at 555.

The courts, faced with the question of the deductibility of payments by a transferee of a franchise, looked to section 167, and particularly, to section 1.167(a)–3, Income Tax Regs., which sets forth the guidelines for amortization of intangible assets. The deductibility or amortization of payments in connection with the acquisition of franchises depended upon whether the franchise had a reasonably determinable useful life. See *Triangle Publications, Inc. v. Commissioner*, 54 T.C. 138 (1970); *Dunn v. United States*, 259 F. Supp. 828 (W.D. Okla. 1966), affd. 400 F.2d 679 (10th Cir. 1968); *Dairy Queen of Oklahoma, Inc. v. Commissioner*, 250 F.2d 503 (10th Cir. 1957).

Section 1253(d)(2) now provides for the deduction through amortization of such initial or acquisition payments over a period no longer than 10 years. In order for such amounts to be deductible under section 1253(d)(2), however, the taxpayer must be operating or conducting a trade or business after the payments are made. The mere signing of an agreement for the transfer of a franchise or distributorship, and payment of the acquisition or initial fees, do not, ipso facto, entitle the taxpayer to a deduction.[51]

We hold, accordingly, that petitioners are not entitled to the claimed deductions in connection with the acquisition fee.[52]

Finally, having determined that petitioners were not engaged in the TireSaver activity for profit, viz, that they are not entitled to any deductions under section 162(a), or 1253(d), we must now turn to whether section 183 provides petitioners any

---

[51]Initial or acquisition payments by transferees of franchises that do not satisfy the requirements of secs. 1253(a) and 1253(d)(2) are to be treated as under old law; thus, if the transferee has purchased an intangible asset and the requirements of secs. 167 and 1.167(a)–3, Income Tax Regs.,—that the asset be used in the trade or business for only a limited period, the length of which can be estimated with reasonable accuracy—he will be entitled to deductions, otherwise no deductions may be taken. See S. Rept. 91–552 (1969), 1969–3 C.B. 423, 556.

Payments under sec. 1253(d)(1) must also be incurred in the context of a trade or business. We do not think that Congress intended to enact a different standard, exempting initial payments by transferees pursuant to transfers covered by sec. 1253(a) from the general requirement that there be a trade or business.

[52]Petitioners may not deduct any amounts in connection with the promotional expense fees as these were amounts which were to be held in escrow and returned to petitioner upon submittal of a proposal, as specified by the distributor agreement.

relief. Section 183(b)(2) allows those deductions which would otherwise be permitted only if the activity was engaged in for profit, but only to the extent that the gross income from the activity exceeds the deductions allowed under subsection (b)(1).[53] As no gross income was ever generated by petitioner's TireSaver activity, section 183(b)(2) is of no benefit to them.

To reflect the foregoing,

*Decision will be entered for the respondent.*

---

[53]Petitioners obtain no benefit for the provisions of sec. 183(b)(1) as we have determined, *supra*, that the interest expense, dependent on the proper accrual of the notes, is not deductible.