FRANK S. LOCKWOOD AND LINDA P. LOCKWOOD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lockwood v. Commissioner
Docket No. 22530-87
United States Tax Court
T.C. Memo 1989-519; 1989 Tax Ct. Memo LEXIS 519; 58 T.C.M. (CCH) 215; T.C.M. (RIA) 89519; September 25, 1989
L. Guy Palmer and Donald C. Shine, for the petitioners. Janine M. Poronsky, for the respondent. RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION RUWE, Judge: In a notice of deficiency dated April 9, 1987, respondent determined a deficiency in petitioners' 1982 Federal income tax and additions to tax as follows: Additions to Tax
Deficiency
Sec. 6653(a)(1) [1]
Sec. 6653(a)(2)
Sec. 6661(a)
$ 26,492.00
$ 1,324.60 50 percent of the
$ 2,649.20 interest due on $ 26,492.00
*521 After a concession by petitioners, [2] the issues for decision are: (1) Whether petitioners' antique automobile rental activity was engaged in for profit within the meaning of section 183; and (2) whether petitioners are liable for additions to tax pursuant to sections 6653(a) (1), 6653(a)(2), and 6661(a). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners timely filed a joint income tax return for the taxable year 1982 with the Internal Revenue Service Center at Kansas City, Missouri. Petitioners resided in Barrington, Illinois when they filed their petition in this case. During 1976, Frank S. Lockwood (hereinafter petitioner) leased an automobile for his personal use from Apple Rent-A-Car (Apple). Apple was owned, in part, by John Preola and was in the business of leasing and renting automobiles. Mr. Preola also made available for rental a 1936 Buick for weddings and private parties. From his conversations with Mr. Preola, petitioner *522 became interested in acquiring an antique automobile. In 1980, petitioner looked at a Packard and a Cadillac, but decided that both of these cars were too expensive to purchase and would require extensive repairs. Petitioner eventually became interested in acquiring a Rolls Royce. To facilitate his locating a suitable Rolls Royce, petitioner spoke with a number of Rolls Royce collectors, some of whom were his neighbors, in the Barrington, Illinois area. These individuals provided petitioner with the name of an individual selling an old Rolls Royce and the name of a mechanic who specialized in the restoration and repair of Rolls Royce automobiles. The individual selling the Rolls Royce was Mark Tuthill. Mr. Tuthill had produced the television series "The Beverly Hillbillies" and had used the car in the show. Mr. Tuthill wanted $ 25,000 for the car, a 1938 Rolls Royce Phantom III. Petitioner was also referred to Wally Donahue who was supposed to be an expert in the restoration of Rolls Royce engines and transmissions. Mr. Donahue was familiar with this particular Rolls Royce and was doing some restoration work on it at this time in his shop in Detroit, Michigan. In the fall *523 of 1980, petitioner called Mr. Donahue to inquire about Mr. Tuthill's Rolls Royce. Mr. Donahue informed petitioner that in his opinion the car was worth more than $ 25,000. Mr. Donahue also told petitioner that it would cost approximately $ 15,000 to restore the car to operating condition so that it could be used as a limousine. Following his conversation with Mr. Donahue, petitioner bought the car from Mr. Tuthill for $ 25,000. The car was sold in as-is condition. According to petitioner, he expected to spend the additional $ 15,000 to replace the tires and battery, clean-up the interior, and to chemically treat the aluminum block engine. After acquiring the Rolls Royce, petitioner travelled to Michigan to see it. Petitioner met with Mr. Donahue and agreed to spend $ 3,500 to have the engine chemically treated. After this work was completed in February 1981, the car was shipped to petitioner's home in Barrington, Illinois. When the Rolls Royce was delivered, petitioner noted that the car had some dents and that the paint was chipped. Petitioner, therefore, decided to have the car painted. One of the individuals who had referred petitioner to Mr. Tuthill and Mr. Donahue *524 told petitioner that Jan Schlabowske ran an expert automotive paint shop in Milwaukee. Petitioner spoke with Mr. Schlabowske and agreed to have the dents repaired and the car painted for approximately $ 7,800. Mr. Donahue's original estimate of $ 15,000 did not include the cost of painting the car. The car was subsequently driven to Mr. Schlabowske's shop to be painted. The Rolls Royce spent approximately two years in Mr. Schlabowske's shop undergoing repairs and restoration. Apparently, mechanical and cosmetic defects requiring extensive repairs were discovered while the car was being prepared for repainting. Whenever possible, petitioner insisted on using replacement parts available in the United States, rather than the more expensive original equipment parts available in England. Between 1980 and 1982, petitioner spent $ 120,805.73 to restore the Rolls Royce. In addition to the restoration work, petitioner installed a console with a television, stereo, and bar in the back seat of the car. Petitioner had rented limousines with this type of equipment and believed that such a console would make his Rolls Royce more appealing. The cost of installing this console was not part *525 of the original $ 15,000 repair estimate. The restoration was completed in 1982 and the car was delivered to petitioner and available for rental in December of that year. Petitioner and Mr. Preola had previously discussed an arrangement under which Apple would make the car available for rental in Chicago, Illinois, maintain the car, provide drivers, and take care of all advertising. Under the terms discussed, petitioner and Apple would equally split all rental receipts. An operating agreement containing these terms was prepared in late November 1982 by petitioner's attorney, Paul Gerbosi. Petitioner signed this document and sent it to Mr. Preola during the first week of December. Although petitioner asked Mr. Preola to sign and return the contract, an executed copy of the operating agreement was never returned to petitioner. Upon receiving the car from Mr. Schlabowske, petitioner advised Mr. Perola that he could begin making the car available for rentals. Mr. Perola subsequently secured one rental for the car during December 1982. The rental fee was $ 500. Sometime during that same month, Mr. Perola advised petitioner that he was leaving Apple. Mr. Perola's partner in *526 Apple apparently was never aware of any agreement between petitioner and Mr. Perola and refused to ratify the contract. With no rental agent or agreement, petitioner parked the Rolls Royce in his garage in Barrington, Illinois. Following the collapse of the rental arrangement with Apple, petitioner personally contacted a number of individuals to try to arrange rentals. Petitioner approached a friend who managed a Hilton Hotel in Lisle, Illinois. They agreed, without entering into a written contract, that the hotel would inform guests holding weddings at the hotel that the car was available for rental for $ 500. Petitioner also contacted other car rental companies in an effort to secure a rental agreement. These companies, however, were not interested in offering the Rolls Royce for rental. Petitioner also relied on his personal contacts to arrange rentals. Petitioner spoke to some of his acquaintances and hung a small handwritten sign at the local supermarket for a year and a half. His efforts, however, were not very successful. Aside from the one rental through Apple in December 1982, the car was rented seven times during 1983. Each rental was for $ 500. On each of these *527 occasions, petitioner could not find a chauffeur and had to drive the car himself. Petitioner never advertised the availability of the Rolls Royce in newspapers, on television, or in the phone book. Petitioner did not have a separate telephone number for his car rental activity. All expenses associated with the car rental activity were paid from petitioner's personal bank account. To keep informed about the Rolls Royce market, petitioner discussed the antique car business with other Rolls Royce collectors and read a number of publications. These publications discussed maintenance and mechanical specifications and contained ads with offers to buy and sell Rolls Royce automobiles. Petitioner also received flyers announcing auction sales of antique cars. These announcements often provided price quotes for antique Rolls Royce automobiles. The 1938 Rolls Royce Phantom III is a rare car. At the time of trial petitioner was trying to sell the car and believed it was worth between $ 150,000 and $ 175,000. On his 1982 Federal income tax return, petitioner reported income from wages of $ 591,400, interest income of $ 1,096, dividend income of $ 1,015, and a $ 1,166 capital gain. *528 On his 1982 Form Schedule C, petitioner reported gross receipts of $ 500 [3] and claimed a depreciation deduction of $ 37,306 in connection with the car rental activity. Petitioner also filed Forms Schedule C in connection with the car rental activity in 1983 and 1984. For 1983, petitioner reported gross receipts of $ 3,750 and a depreciation deduction of $ 56,705. For 1984, petitioner reported gross receipts of $ 1,650 and a depreciation deduction of $ 55,212. No additional items of income or expense are reported on the 1982, 1983, or 1984 Forms Schedule C. Petitioner did not file Forms Schedule C for the car rental activity for 1985 or 1986. OPINION The primary issue for decision is whether petitioner's antique automobile rental activity was an activity not engaged in for profit. Section 183(a) provides that if a taxpayer's activity constitutes an activity "not engaged in for profit," expenses arising out of the activity are allowed as deductions only as provided *529 in section 183(b). An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Section 162 generally permits the deduction of expenses incurred in a trade or business and paragraphs (1) and (2) of section 212 generally permit a similar deduction for expenses incurred "for the production or collection of income" or "for the management, conservation, or maintenance of property held for the production of income." In order to deduct expenses of an activity under either section 162 or 212, a taxpayer must show that he engaged in the activity with an "actual and honest objective of making a profit." Dreicer v. Commissioner, 78 T.C. 642, 643-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Dean v. Commissioner, 83 T.C. 56, 74 (1984); Fuchs v. Commissioner, 83 T.C. 79, 98 (1984). While a reasonable expectation of profit is unnecessary, a taxpayer's profit objective must be bona fide. Dreicer v. Commissioner, supra at 645; *530 Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981). Whether there is an objective to make a profit is a factual issue to be resolved on the basis of all the facts and circumstances. Takahashi v. Commissioner, 87 T.C. 126, 133 (1986); Finoli v. Commissioner, 86 T.C. 697, 722 (1986); Allen v. Commissioner, 72 T.C. 28, 34 (1979). "Profit" means economic profit, independent of tax savings. Herrick v. Commissioner, 85 T.C. 237, 255 (1985); Surloff v. Commissioner, 81 T.C. 210, 233 (1983). The burden of establishing the requisite profit objective is on petitioner. Beck v. Commissioner, 85 T.C. 557, 569 (1985); Flowers v. Commissioner, 80 T.C. 914, 931 (1983). Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of nine objective factors relevant to the determination of whether an activity is engaged in for profit. The nine factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and *531 effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, that are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation involved in the activity. Not all of these factors are applicable in every case and no one factor is controlling. Sec. 1.183-2(b), Income Tax Regs.; Abramson v. Commissioner , 86 T.C. 360, 371 (1986); Allen v. Commissioner, supra at 34. Petitioner did not carry on the antique automobile rental activity in a businesslike manner. Petitioner did not prepare for the activity by either conducting an extensive study of accepted business practices or consulting an expert. Although we are convinced that petitioner investigated the antique automobile market before purchasing the Rolls Royce, there is little evidence indicating that petitioner investigated the rental market for antique automobiles. *532 Indeed, aside from vague references to conversations with Mr. Preola concerning the amount of rentals that the 1936 Buick generated, petitioner has failed to offer any evidence establishing that he evaluated the market for antique car rentals. We are unable to find that any comments Mr. Preola may have made four years before petitioner actually bought the Rolls Royce and six years before the Rolls Royce was available for rental, are sufficient to establish that petitioner adequately investigated the antique car rental business. In further support of our conclusion that petitioner failed to evaluate the market for antique car rentals, we find the fact that petitioner was unable to locate another car rental company willing to make his car available for rental after the arrangement with Apple collapsed to be significant. At a minimum, petitioner's failure to obtain another rental agreement demonstrates that he failed to adequately investigate the demand for antique automobile rentals in Chicago, Illinois. Petitioner's failure to carry on the antique automobile rental activity in a businesslike manner is also evident from the fact that he authorized Apple to make a $ 150,000 automobile *533 available for rental without first having obtained an executed rental agreement. Likewise, petitioner's failure to advertise the car in the phone book, to maintain a separate bank account for the business, and to keep separate books for the business also demonstrate that petitioner was not engaged in this activity with the requisite profit objective. Akers v. Commissioner, T. C. Memo. 1981-627. We also find significant the fact that petitioner had no expertise in the antique car rental business. Petitioner did speak to knowledgeable individuals concerning the sale and restoration of antique cars, but none of these individuals, with the exception of Mr. Perola, has been shown to have any expertise in the car rental business. Petitioner spent $ 25,000 to acquire the Rolls Royce. Petitioner testified that he thought that he could make a profit renting the car if he spent an additional $ 15,000 to prepare it for use as a limousine. As the costs to restore and repair the car climbed from $ 15,000 to over $ 120,000 (an increase of 800 percent), it should have become evident to petitioner that his original estimates would have to be substantially revised. These additional *534 costs were not attributable to "unforeseen circumstances" as petitioner argues on brief. Instead, these costs are directly attributable to petitioner's failure to evaluate the condition of the Rolls Royce and to concern himself with the relationship between costs and the potential income that might be generated. This conduct indicates that petitioner did not engage in this activity in a businesslike manner. In further support of his argument that he possessed the requisite profit objective, petitioner points to his success in another venture. While we agree that the success of a taxpayer in carrying on other similar or dissimilar activities is one element to consider in determining whether an activity is engaged in for profit, we do not find this factor significant in this case. We do not believe that petitioner's profitable investment in a shopping mall is sufficient, based on the facts presented, to establish that petitioner engaged in the antique car rental activity with the requisite profit objective. The fact that petitioner did not spend a significant amount of time trying to arrange rentals also demonstrates that he did not possess the requisite profit objective. After *535 the agreement with Apple collapsed, petitioner made minimal efforts to secure rentals. Petitioner's reliance on informal personal contacts and his use of a small handwritten sign at a local grocery store demonstrate a non-businesslike manner of operation. Akers v. Commissioner, supra.Similarly, petitioner's failure to enter into a written contract with the Hilton Hotel further establishes the informal manner in which petitioner carried on his rental operation. Petitioner had a $ 150,000 automobile sitting in his garage, yet he chose to rely on a number of informal contacts and a small handwritten sign to solicit business. This type of conduct supports our conclusion that petitioner did not engage in the car rental activity with the requisite profit objective. During the year in issue, petitioner had substantial income from sources other than the car rental activity. "Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit * * *." Sec. 1.183-2(b)(8), Income Tax Regs. It seems likely that one reason petitioner went into the *536 antique car rental business was to obtain tax deductions and credits, thereby reducing the tax petitioner would otherwise have to pay on his substantial income from other sources. In the notice of deficiency, respondent determined that petitioner is liable for additions to tax under section 6653(a)(1) and (2) for negligence or intentional disregard of the rules and regulations. Petitioner bears the burden of proving that he is not liable for these additions to tax. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). Petitioner has failed to present any evidence on this issue and, accordingly, respondent's determinations will be sustained. Respondent also determined that petitioner is liable for an addition to tax under section 6661. Section 6661 imposes an addition to tax in an amount equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. [4]Pallottini v. Commissioner,90 T.C. 498 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 5,000. Sec. 6661(b)(1). *537 Under section 6661(b)(2)(B), an understatement may be reduced if the taxpayer shows that there was substantial authority for the taxpayer's treatment of the item, or that the relevant facts affecting the tax treatment of the item are adequately disclosed on the return. Petitioner has presented no evidence that either of these exceptions apply. Petitioner is liable for the addition to tax under section 6661. Petitioner did not conduct his activity with a bona fide profit objective. His antique car rental activity was not a trade or business or an activity entered into for the production of income. Sec. 183(c). Respondent's determinations, as set forth in the notice of deficiency, are sustained. Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and as in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioners concede that they failed to report as income $ 1,176 from a refund of Illinois state income tax.↩
3. Petitioner did not explain why the entire $ 500 rental fee was reported on his return. According to the terms of the rental agreement, the rental fees were to be split equally between Apple and petitioner.↩
4. The Omnibus Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002(a), 100 Stat. 1874, 1951, increased the section 6661(a) addition to tax to 25 percent of the underpayment attributable to a substantial understatement for additions to tax assessed after October 21, 1986. Respondent, however, has not amended his answer to seek an increase to the section 6661(a) addition to tax over the amount determined in the notice of deficiency. Accordingly, we sustain respondent's determination as set forth in the notice of deficiency.↩