RONALD DALE LARSON, SR. AND MARCELLE A. LARSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Larson v. Commissioner
Docket No. 4510-89
United States Tax Court
T.C. Memo 1991-99; 1991 Tax Ct. Memo LEXIS 118; 61 T.C.M. (CCH) 2085; T.C.M. (RIA) 91099; March 6, 1991, Filed *118 Decision will be entered under Rule 155. Ronald Dale Larson, Sr., pro se. Wendy S. Harris, for the respondent. PATE, Special Trial Judge. PATE
MEMORANDUM FINDINGS OF FACT AND OPINION This case was heard pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. [1]
Respondent determined deficiencies of $ 2,932 and $ 3,333 in petitioners' Federal income taxes for 1984 and 1985. The sole issue for our decision is whether petitioners operated their dog kennel with an actual and honest profit objective. FINDINGS OF FACT Ronald Dale Larson, Sr., and Marcelle A. Larson (hereinafter petitioners) are husband and wife and filed joint income tax returns for 1984 and 1985. They resided in Las Vegas, Nevada, at the time they filed their petition. Some of the facts have been stipulated, and the stipulation of facts *119 and the attached exhibits are incorporated herein by this reference. During 1984 and 1985, Mr. Larson was employed full time as a pressman and Mrs. Larson was employed full time as a secretary. They reported $ 37,733 and $ 40,172 in total wages during those years. For the years 1982 through 1986, petitioners also bred and sold Shetland sheepdogs (hereinafter Shelties) under the pseudonym "Silva Wind Shelties" (hereinafter kennel). On their 1984 and 1985 income tax returns, petitioners reported receipts from their kennel of $ 1,050 and $ 2,050 for the years 1984 and 1985, respectively. After deducting expenses, they reported losses of $ 14,757 and $ 16,907, respectively. However, at trial, the parties agreed that: (1) if the Court decides that petitioners operated their kennel for profit, then: a. For 1984, petitioners may deduct business expenses of $ 7,407.42; b. For 1985, petitioners may deduct business expenses of $ 9,617.18; and
(2) if the Court decides that petitioners operated their kennel without a profit objective, then: a. For 1984, petitioners may deduct additional itemized deductions of $ 2,075. b. For 1985, petitioners may deduct additional *120 itemized deductions of $ 1,050.
Petitioners operated their kennel as "dog fanciers." As such, they were not required by Nevada to obtain a kennel license or health certificates for their dogs. However, as dog fanciers, they were limited to breeding five adult dogs. To breed any greater number would have required a license as a "dog breeder." In 1984 and 1985, petitioners owned three bitches (female dogs) and two studs (male dogs). They bred each bitch approximately three times within the two year period, with each litter producing approximately six puppies. Petitioners were members of the American Kennel Club (hereinafter the AKC) and operated their kennel strictly in accordance with AKC rules. They believed in the ethical practices promoted by the AKC and, in fact, complained about a breeder violating such controls. Consequently, all of the Shelties handled by petitioners were both bred and raised in conformity with those standards. Petitioners spent a great deal of their time with their Shelties. They provided them with the most intensive care because they felt that proper nurturing would "socialize" their animals and thereby make them better pets. Much of the record *121 is devoted to a description of such care. Admittedly, they did this not only to improve the quality of their puppies, but because they derived personal gratification from handling them. To house their Shelties, petitioners built an enclosed kennel adjacent to their home. In addition, they used a spare bedroom for birthing puppies and for keeping records. Prior to starting their kennel, petitioners had no training or experience in breeding or caring for dogs. However, they took the time to educate themselves. They were interested in building up a renowned kennel with a reputation for quality Shelties. To pursue this goal, they entered several of their Shelties in dog shows in attempts to win championship status. In some instances, they were able to secure professional handlers to assist them. Although several of their dogs won ribbons and awards, none became champions. Petitioners advertised in newspapers and magazines when they had puppies for sale. They also sent cards to prospective purchasers at Christmastime. During 1984, they offered approximately 20-25 puppies for sale, but sold only seven for $ 1,075. [2] They sold eight puppies in 1985 for $ 1,805. Petitioners *122 also reported income from fees charged for administering vaccinations to puppies that they sold. Prices for Shelties in the years in issue ranged from $ 100 to $ 350. Petitioners anticipated selling approximately 35 puppies per year with their present facilities and hoped to eventually expand their operations. One of petitioners' major concerns when selling puppies was to place them in a good home. They remained in contact with purchasers to ensure that the puppies received proper care and allowed purchasers to return puppies that were not receiving proper care. They would often "dog sit" for dogs they sold, for free or for a nominal fee, when the purchasers went on vacation. When unable to sell a puppy, they gave it away to a good home. Petitioners attempted to reduce their costs by grooming their own dogs, administering vaccinations, assisting in litter births, *123 and other routine veterinarian duties. However, they compensated their sons (at the rate of $ 1.50 per day) when the boys cared for the dogs. With regard to recordkeeping, petitioners did not maintain a separate checking account for their dog breeding activities; they used their personal checking account. However, they had business cards and stationery imprinted, pre-printed sales invoices, kept a ledger in which they recorded expenditures for various expenses (dog food, supplies, veterinary charges, etc.), and kept copies of sales invoices for the puppies they sold. In 1986, after four years of operations, petitioners ceased selling dogs because they became convinced that they could not command the prices for their puppies which would enable them to realize a profit. They now keep their five dogs as pets. OPINION In order to deduct losses incurred in any activity, a taxpayer must show that he entered into the activity, or continued the activity, with the objective of making a profit from such activity. Sec. 1.183-2(a), Income Tax Regs. If the taxpayer engages in the activity without such profit objective, deductions attributable to such activity are allowed, but only to *124 the extent of the income derived from the activity. Sec. 183. The test under section 183 is whether the individual engaged in the activity with an actual and honest objective of making a profit. Beck v. Commissioner, 85 T.C. 557, 569 (1985); Flowers v. Commissioner, 80 T.C. 914, 931 (1983); Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). In this context, profit means economic profit, independent of tax savings. Landry v. Commissioner, 86 T.C. 1284, 1303 (1986); Herrick v. Commissioner, 85 T.C. 237, 255 (1985); Estate of Baron v. Commissioner, 83 T.C. 542, 557-559 (1984), affd. 798 F.2d 65 (2d Cir. 1986); Surloff v. Commissioner, 81 T.C. 210, 233 (1983). While a reasonable expectation of profit is not required, the taxpayer's profit objective must be bona fide. Fox v. Commissioner, 80 T.C. 972, 1006 (1983), *125 affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5, 6-7, 9 (3d Cir. 1984). The burden of proof is on the taxpayer to show that he engaged in the activity with the objective of realizing an economic profit. Rule 142(a). In making this determination, all relevant facts and circumstance are to be taken into account. Finoli v. Commissioner, 86 T.C. 697, 722 (1986); Jasionowski v. Commissioner, 66 T.C. 312, 321 (1976). Greater weight must be given to objective facts than to petitioner's mere statements of intent. Sec. 1.183-2(a), Income Tax Regs.; Siegel v. Commissioner, 78 T.C. 659, 699 (1982); Engdahl v. Commissioner, 72 T.C. 659, 666 (1979). Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors which should normally be considered in determining whether *126 an activity is engaged in with the requisite profit objective. The nine factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor, nor the existence of even a majority of the factors, is controlling, but rather it is an evaluation of all the facts and circumstances in the case taken as a whole which is determinative. Sec. 1.183-2(b), Income Tax Regs.; Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Benz v. Commissioner, 63 T.C. 375, 382 (1974). In applying these criteria to petitioners' operations, we find that they operated in a businesslike manner. They built *127 a kennel to adequately house their Shelties and acquired supplies and equipment suitable for raising them. They exhibited their dogs at shows in attempts to establish a good reputation for their kennel, thereby enhancing the prices their puppies would command. They advertised and sent cards to prospective customers to spur sales. In addition, they kept records necessary to keep track of the kennel's profitability. Petitioners devoted a good deal of the time left free from their employment to their kennel. They obviously were interested in building up a quality operation, and personally spent a considerable amount of time birthing, grooming, feeding, exercising, and "socializing" their puppies. Respondent argues that the five successive losses reported by petitioners show that they did not have a profit objective. He reasons that "where the taxpayer has substantial assets and sources of income outside of the activity, it is more probable that the activity is not profit motivated." Sampson v. Commissioner, T.C. Memo 1982-276. However, petitioners did not have "substantial" assets or "substantial" outside income. Although it is true that petitioners earned *128 good wages, they were not "high income" in the sense that they had a lot of extra disposable income. In fact, financing their kennel created a hardship on them. Respondent also argues that petitioners did not maintain a formal set of books and records or a separate checking account for their kennel and this indicates the lack of a profit objective. See section 1.183-2(b)(1), Income Tax Regs. Although petitioners' records were not kept in a neat professional manner, when we factor in the newness of their venture and their lack of training in accounting, the records were adequate. Moreover, the absence of a separate checking account does not necessarily indicate an unbusinesslike manner. See Engdahl v. Commissioner, 72 T.C. at 667. Finally, respondent points to the enjoyment petitioners got from raising dogs to show that it was a hobby. However, merely because a person might enjoy his business does not mean that it is a hobby or undertaken for personal reasons. As stated in section 1.183-2(b)(9), Income Tax Regs.: the fact that the taxpayer derives personal pleasure from engaging in the activity is not sufficient to cause the activity to be classified *129 as not engaged in for profit if the activity is, in fact, engaged in for profit as evidenced by other factors * * *.
Therefore, as long as the activity was entered into with an actual and honest objective of making a profit, the deduction of a loss is not precluded by section 183. Nor do we give much credence to respondent's position that the intensive care petitioners lavished on their puppies indicated that they were not concerned with making a profit. Petitioners were interested in building a quality operation, not a "puppy mill," and believed that the extra handling would "pay off" with better puppies for which they could charge a higher price. It was not until they had operated their kennel for some time that they became convinced that this concept would not produce the expected profits. They then discontinued operations. We believe that petitioners started their kennel with the goal of producing a profit from an activity which they enjoyed. Due to their lack of experience at inception, they may not have fully realized the obstacles that they would have to surmount to accomplish that goal. They devoted their best efforts to the enterprise, but after a few years came *130 to understand that the profits they anticipated had not been and were not likely to be realized. At that time, they discontinued their operations. This pattern is not unusual; it befalls many new entrepreneurs. In summary, despite the absence of profits during the years in question, we think that the work which petitioners took on was just too arduous and the relative financial commitment too large, when compared with petitioners' outside income, to construe the operation of their kennel as a hobby. Moreover, petitioners ran their kennel in a manner befitting a small business. For these reasons, we find that petitioners had an actual and honest objective of profit, and accordingly, may deduct the losses they sustained in operating their kennel. Due to the stipulations of the parties -- Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect for the year in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Because petitioners reported gross income from their kennel of only $ 1,050, our finding results in an increase in their gross income for 1984 of $ 25.↩