PAUL DWYER AND JANICE L. DWYER, ET AL., Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Dwyer v. Commissioner
Docket Nos. 42696-86, 35795-87, 28400-88
United States Tax Court
T.C. Memo 1991-123; 1991 Tax Ct. Memo LEXIS 141; 61 T.C.M. (CCH) 2187; T.C.M. (RIA) 91123; March 19, 1991, Filed *141 Decisions will be entered under Rule 155. Robert A. Wherry, Jr., for the petitioners. Richard D. D'Estrada, for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION During the years 1980 through 1986, petitioners deducted net losses and claimed investment credits associated with auto racing activities of petitioner Paul S. Dwyer, and petitioners' son, Clark Dwyer. After concessions, [1] the sole issues for decision are: (1) Whether petitioners' auto racing activity in 1980 and 1981 was engaged in for profit. We hold that it was not; and (2) whether petitioners' support of Clark Dwyer's racing activity in 1980 to 1986 was an activity engaged in for profit. We hold that it was. Respondent determined deficiencies in and additions to petitioners' Federal *142 income taxes and increased interest as follows: Additions to Tax and Increased Interest Sec.
Sec.
Sec.
Year
Income Tax
[2]6653(a) [3]6653(a)(1) 6653(a)(2)
1978
$ 64,013 --  --  --
1980
$ 36,836 $ 1,842
--  --
1981
22,218
--  $ 1,111 * 1982
91,038
--  4,552
* 1983
48,404
--  2,420
* 1984
69,464
--  3,473
* 1985
64,875
--  3,244
* 1986
339,495
--  16,975
* Sec.
Sec.
Year
6661
[4]6621(c) *143 1978
--  --
1980
--  **
1981
--  **
1982
$ 9,104 **
1983
5,763
**
1984
-- **
1985
-- **
1986
78,590
**
The only issue in dispute for taxable year 1978 is the amount of net operating loss carryback from subsequent years, which amount will be ascertainable after a decision in this case. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Background
Petitioners resided in Colorado Springs, Colorado, at the time they filed their petition. All references to petitioner are to Paul S. Dwyer. Petitioners filed joint Federal income tax returns for the years at issue. Respondent disallowed petitioners' Schedule C losses relating to their auto racing activity for taxable years 1980 through 1986. Petitioners reported gross receipts and expenses from their auto racing activity during taxable *144 years 1980 through 1986 as follows: Year
Gross Receipts
Expenses
Net Loss
1980
$ 3,368 $ 57,065 $ 53,697 1981
24,365
190,787
166,422
1982
13,929
188,012
174,083
1983
15,000
152,595
137,595
1984
26,970
141,409
114,439
1985
6,917
134,825
127,908
1986
1,800
22,715
20,915
Petitioner is an attorney. He practiced law from 1951 to 1966 and has not practiced law since 1966. He and a partner formed Land Development Specialists, Inc. (LDS), which became a relatively successful real estate development and sales business. Petitioner received compensation in excess of $ 200,000 from LDS in all the years at issue. 2. Dwyer Enterprises
In 1973, petitioner opened a checking account in the name of Paul Dwyer Enterprises (Dwyer Enterprises) to handle business investments which were not connected with LDS. Later, in 1979, Dwyer Enterprises was the name under which petitioner and his family conducted auto racing. Petitioner, acting in the name of Dwyer Enterprises, bore the auto racing expenses for himself and his son, Clark Dwyer (hereafter Clark). References in this opinion to Dwyer Enterprises are to the auto racing activity. Petitioner drove *145 from 1980 to 1981, as a part-time activity in addition to his real estate business activities. Clark drove full time most of the time from 1980 to 1986, and did not otherwise work or attend school during most of those years. 3. The Auto Racing Industry
NASCAR (National Association for Stock Car Auto Racing) is the largest motor sports organization in the world. NASCAR has two divisions: the Grand National (Winston Cup) and the Grand American. The Grand American circuit is analogous to baseball's minor leagues, and the Winston Cup circuit is analogous to the major leagues. Historically, drivers gain experience at Grand American races necessary to compete at the Winston Cup level. Most Winston Cup race cars are financed by sponsors. However, some are operated by independents. For example, Roger Hamby, D. K. Ulrich, and Elmo Langley were independent operators. Family owned and supported racing teams are common in NASCAR racing and have been since NASCAR's inception in 1948. Many family-owned teams have achieved racing and economic success on the NASCAR Winston Cup circuit. Winston Cup racing is potentially a very profitable business. NASCAR provides purses of hundreds *146 of thousands of dollars at each Winston Cup race, plus numerous additional bonus money programs. For each of the years at issue, at least one race offered a purse exceeding $ 1,000,000. See the appendix for a list of purses at Winston Cup races in which Clark competed. Corporate sponsors, such as Procter & Gamble, R.J. Reynolds, General Motors, and Coors, budget millions of dollars for NASCAR sponsorships. 4. Colorado-Based Racing Activities for Paul and Clark Dwyer (1979 to 1981)
a. 1979
Petitioner had a long-standing interest in cars and was a frequent spectator at auto races. In 1979 he began to take Clark to automobile races at the Colorado Springs International Speedway (CSIS), a NASCAR sanctioned track. In 1979, petitioner met Mike Bonicelli (Bonicelli), a race car driver who was the CSIS 1979 track champion. Petitioner, Clark, and Bonicelli met and discussed NASCAR racing, driving, and financial aspects of auto racing. Petitioner investigated NASCAR racing and decided in late 1979 that he and Clark would become active in racing. b. 1980
In January 1980, the Dwyer Enterprises Racing Division was started, and petitioner commenced auto racing activities *147 with Clark. Petitioner, doing business as Dwyer Enterprises, purchased a Camaro racing car from Bonicelli for $ 9,000. Dwyer Enterprises leased approximately 2,400 square feet of space to be used as a shop beginning in February 1980 and continuing through December 1, 1982. In March 1980, petitioner purchased two adjoining one-half-acre parcels adjacent to the leased property for $ 100,000. In February 1980, Dwyer Enterprises purchased a second Camaro racing car and towing trailer from Charles McAllister for $ 16,500. In the spring of 1980, Dwyer Enterprises purchased a used one-ton truck from Bonicelli, with a tilt bed for race car hauling, and a substantial number of automobile tools. Petitioner and Clark attended the one-week Southards School of High Performance Circle Track Racing, located in Tracy, California, in March 1980. In April 1980, Dwyer Enterprises began racing at CSIS. In May 1980, Donnie Allison, a top NASCAR and CART (Indy) driver, drove Dwyer Enterprises' #19 Camaro at the CSIS. Dwyer Enterprises continued racing in the spring and summer of 1980 at CSIS. Clark was the 1980 Rookie of the Year at CSIS. In August 1980, Dwyer Enterprises sent a race team, [5] *148 with Clark as driver, to race at Bakersfield, California. Clark won the 35-lap main event and $ 1,500. This was noteworthy because Clark was only 16 years old at the time and he had never driven a race car before 1980. In the fall of 1980, Clark returned to his junior year at Wasson High School in Colorado Springs. After several conversations with the school about Clark's NASCAR racing, petitioners agreed to permit Clark to leave school to pursue racing. Dwyer Enterprises raced in the CSIS Grand Finale Budweiser 200 in early October 1980. The race was won by Larry Detjens (Detjens), a Wisconsin driver, who met and befriended Clark. Clark drove the Dwyer Enterprises #9 Camaro to a fifth-place finish in that race. Thereafter, Clark and a race team *149 went to California and Nevada to complete a five-race series in California and Las Vegas. Petitioner joined the team with his car for the final Las Vegas race in late October. During 1980 petitioner drove in 22 racing events and Clark drove in approximately 22 to 28 events. In November 1980, Dwyer Enterprises purchased another race car, two engines, and a trailer from Ralph Royer for $ 20,000. In January 1981 Dwyer Enterprises purchased a Dillon car chassis from Donnie Wilson for $ 6,175. At the conclusion of the 1980 racing season, petitioner and Clark reviewed the results of their NASCAR activities and made racing plans for the ensuing year. Petitioner and Clark decided to upgrade their racing cars and equipment. They also decided to increase their efforts to get sponsorships. To accomplish this, they sought to have Clark race all over the country. In addition, Mrs. Dwyer began working to obtain a sponsor. She sought local sponsorship from the Colorado Springs Pepsi bottler and the Coors beer distributor. Clark began driving in races with first place purses of $ 5,000, rather than $ 500. c. 1981
Dwyer Enterprises began the 1981 racing season in February at the *150 Phoenix International Speedway. Clark drove the #9 Camaro. He was leading in a qualifying race but ran out of gasoline and failed to qualify. Upon returning to Colorado Springs, Dwyer Enterprises completed work on the new car, purchased in late 1980, and took it to California for a series of races. The first race was the Rose Classic at Roseville, California, in which Clark finished seventh in the main event won by Detjens. The Dwyer team then raced at the Shasta Speedway in Anderson, California, and in Bakersfield, California, where Clark finished second winning $ 1,500. Dwyer Enterprises continued racing in Colorado Springs. Clark and petitioner both raced at CSIS in May and June. In July 1981, Dwyer Enterprises sent a race team, with Clark as the driver, to Wisconsin and Illinois to run a series of races. During this period, Detjens often worked with Clark at Detjens' shop to prepare the Dwyer car for racing and to improve Clark's driving skills. The Dwyer Enterprises race team returned to Colorado in August 1981 and learned of Detjens' death in an auto racing accident. Later that month, the Dwyer Enterprises race team entered the AMS/Oil-sponsored racing car events at *151 the Minnesota State Fair. The Dwyer Enterprises race team again went to California to compete in a five-race series, four in California and one in Las Vegas, as they had done in 1980. The first race was at Stockton, California, where Clark finished third in the main event. In early October 1981 the Dwyer Enterprises racing team went to Redding, California, for the second race. However, their 1981 Chevrolet crew-cab truck and racing equipment were stolen from the parking lot of the motel where the team was staying. This resulted in a $ 59,594 loss, after insurance. [6]
Dwyer Enterprises next raced at Anderson, California, where Clark finished 11th in the main event. Using a rented engine to try to stay in the series bonus money, Clark raced at the Saugus *152 Speedway near Los Angeles, and finished 7th. The fourth race of the series was held at Mesa Marin Raceway near Bakersfield, California. Clark won the special 20-lap invitational, but failed to finish in the main event due to engine failure. The last of the series races was in Las Vegas at the Craig Road Speedway. Clark drove in this race, but failed to finish. While at this race, Dwyer Enterprises purchased a 1979 van truck from another driver, Mike Opperman. The truck had been modified to include a built-in auto shop equipment area and a crane for lifting engines. During 1981 petitioner drove in approximately 15 racing events, and Clark drove in approximately 25 events. At the end of the 1981 racing season, petitioner and Clark reviewed the results of their racing activities for the past year. They decided that to be profitable, Clark would have to race at the Winston Cup level. Petitioner decided to quit racing because he was not sufficiently skilled to make a profit. During 1980 and 1981, the Dwyer race team consisted of volunteers, friends, and independent contractors, in addition to Clark and petitioner. Beginning in 1982, full-time professional help was needed to *153 assist Clark in preparing and maintaining the race cars. Two employees were hired, David Wiggins and Chris Boortz. Contract work at the shop was started in an attempt to bring in extra income, but was discontinued shortly thereafter. Petitioners regularly attended races in which Clark competed. Petitioner often worked as team spotter and created the Dwyer Enterprises "race pack" [7] for each race. Petitioner continued his efforts to obtain sponsorship. He also handled many racing-related matters such as locating and leasing the shop, getting phone service, insurance, etc. d. 1982
In early 1982, Dwyer Enterprises ordered a new Bemco race car to replace the older cars worn out from the 1981 race season. While awaiting completion of the new car, Dwyer Enterprises began the 1982 racing season with a series of races in California *154 and Las Vegas. In the first race at Roseville, California, Clark was in second place on the 146th lap of the 150-lap main event when he was hit by the third-place car and ultimately finished fifteenth. During 1982 Clark participated in races held in California, Nebraska, Nevada, Colorado, Wisconsin, Minnesota, and Arizona, driving race cars owned by petitioners. The car driven by Clark at the Phoenix International Speedway in Arizona in 1982 was owned by Roger Hamby. In April 1982, the Dwyer Enterprises racing team returned to Colorado and tested the new Bemco car at the CSIS race track. Dwyer Enterprises then took the Bemco car to the Milwaukee Badgerland 150. The car qualified but then crashed into the wall in a pre-race practice session, and dropped out of the race. On May 30, 1982, Kyle Petty, a then NASCAR Grand National race car driver, visited the CSIS track. At the request of CSIS track officials, Petty drove Dwyer Enterprises' Howe car in the main race. Clark drove the Bemco car. During June and early July 1982, the Bemco car was raced at CSIS and the nose was changed to make it a Firebird rather than a Camaro. At the end of July 1982, Dwyer Enterprises raced in *155 the Miller High Life 200 at the WisconsinState Fair Park Speedway in West Allis, Wisconsin. An early accident in the opening lap forced Clark into the wall to avoid cars on the track. Clark avoided a collision but the car's steering was badly damaged and it was forced out of the race on the second lap. Upon returning to Colorado Springs, Dwyer Enterprises again raced at CSIS. Clark was running second midway through the August 8, 1982, 50-lap race when his car was involved in an accident trying to lap a slower car. In late August 1982, Dwyer Enterprises ran in the 300-lap feature race at the Minnesota State Fair. Clark finished 17th in the 125-lap time trials and 18th in the qualifying race. Clark finished eleventh in the November 28, 1982, NASCAR Winston Cup West race against top Winston Cup Grand National racers. 5. Southeastern U.S.-Based Racing Activities (Winston Cup) for Clark Dwyer (1983 to 1986)
In the fall of 1982, petitioner and Clark were introduced to Roger Hamby (Hamby), a former race car driver and, at that time, an independent NASCAR Grand National car owner. In 1982 petitioners entered into an agreement with Hamby, whereby Clark would run five races *156 on the NASCAR Winston Cup Circuit in 1983 (the maximum allowed by the rules without ending a driver's "rookie status"), driving Hamby's car on a "turnkey" flat charge basis. The cost to petitioners was $ 12,000 per race, and Hamby, as car owner, would retain all winnings. Then, in 1984, Dwyer Enterprises would run Clark for "Rookie of the Year" in all the NASCAR Grand National races. Clark was also to move to Charlotte, North Carolina, to work for Hamby on his team during the other 1983 NASCAR races in order to learn the tracks and improve his driving skills. Petitioner believed that by success in Winston Cup races, Clark could get a sponsor, and that this new approach of buying rides would be a less expensive way to race than continuing to own and operate a complete race team. Regardless of Clark's performance, neither Clark nor petitioners were entitled to any race winnings for these five races in 1983. There was little chance for petitioners to break even in 1983 from their racing activities, absent a sponsor. However, Clark could have qualified for the "winner's circle," which would have provided money to make personal appearances and to drive Hamby's car in subsequent *157 races. Other NASCAR drivers who have driven Hamby-owned cars include Bill Elliott, Lake Speed, Phil Parsons, Morgan Shepherd, and Sterling Marlin, who drove to "Rookie of the Year" honors in 1983. a. 1983
In early 1983 Clark moved to Charlotte, North Carolina, to be closer to the center of NASCAR racing and to begin work as a full-time member of Hamby's NASCAR racing team. Clark resided in North Carolina through 1986. Dwyer Enterprises' first race under the agreement with Hamby was the 1983 Daytona 500, which offered total posted cash dollar awards of more than twice that of any other Winston Cup race. Clark drove Hamby's car and finished 21st in a 42-car field. The second Dwyer Enterprises race of 1983 was the Winston 500 at Talladega, Alabama. In this race, after qualifying 26th, the car's oil pan failed on the 30th lap, and Clark finished 39th. Dwyer Enterprises next raced in the Firecracker 400 at Daytona Beach, Florida. Clark finished 25th. He then raced in the Cola 500 at Pocono, Pennsylvania. Clark left the race after six laps due to failure of the engine's oil pump and finished last. The final Dwyer Enterprises race under the agreement with Hamby was the Budweiser *158 500 at the Dover Downs International Speedway at Dover, Delaware. In that race Clark finished tenth after qualifying 27th. In 1983, petitioners sold their last race car and did not own a race car thereafter during any of the years involved in this case. b. 1984
At the end of 1983, Dwyer Enterprises again negotiated with Hamby to purchase rides on a "turnkey" basis for 1984 and run Clark for "Rookie of the Year." In addition to the $ 40,000 plus prize money, winning Rockie of the Year is instrumental in obtaining sponsorship. Under the arrangement, Hamby was to receive $ 10,000 per race for the first five races, 80 percent of any car winnings, and all car sponsor and race bonus money. Petitioners paid $ 50,000 to Hamby for the first five races in 1984. After that, petitioners paid Hamby what they could. The $ 10,000 per race cost to petitioners to drive Hamby's cars on the NASCAR Winston Cup Circuit was approximately one-third of what the top racing teams on the Winston Cup Circuit charged. In 1984, Clark drove in 26 races on the NASCAR Winston Cup Circuit. He drove for Hamby in 21 of those races. Clark also ran four races in D. K. Ulrich-owned cars, and one in an Elmo *159 Langley-owned car. Dwyer Enterprises' first race in 1984 was at the Daytona International Speedway where Clark qualified 27th and finished the race in 20th place. During the 1984 season, Clark raced in the following events: Finishing
Name of Race
Location
Date
Position
Daytona 500
Daytona Beach, FL
2/19/84
20th
Miller High Life 400
Richmond, VA
2/26/84
27th
Carolina 500
Rockingham, NC
3/4/84
12th
Coca-Cola 500
Hampton, GA
3/18/84
40th
Valleydale 500
Bristol, TN
4/1/84
18th
Northwestern Bank 400
North Wilkesboro,NC
4/8/84
16th
Transouth 500
Darlington, SC
4/15/84
15th
Sovran Bank 500
Martinsville, VA
4/29/84
21st
Winston 500
Talladega, AL
5/6/84
29th
Coors 420
Nashville TN
5/12/84
25th
Budweiser 500
Dover, DE
5/20/84
22nd
World 600
Harrisburg, NC
5/27/84
23rd
Budweiser 400
Riverside, CA
6/3/84
17th
Diamond Mines 500
Long Pond, PA
6/10/84
25th
Miller High Life 400
Brooklyn, MI
6/17/84
39th
Pepsi Firecracker 400
Daytona Beach, FL
7/4/84
25th
Pepsi 420
Nashville, TN
7/14/84
24th
Like Cola 500
Long Pond, PA
7/22/84
15th
Talladega 500
Talladega AL
7/29/84
28th
Champion Sparkplug 400
Brooklyn, MI
8/12/84
40th
Busch 500
Bristol, TN
8/25/84
15th
Southern 500
Darlington, SC
9/2/84
20th
Wrangler Sanforset 400
Richmond, VA
9/9/84
26th
Delaware 500
Dover, DE
9/16/84
18th
American 500
Rockingham, NC
10/21/84
38th
Winston Western 500
Riverside, CA
11/18/84
25th
*160 Dwyer Enterprises ran in 26 of the 30 1984 Winston Cup races. At the end of the 1984 racing season, cars driven by Clark had won $ 114,335. Clark ended up fourth in the "Rookie of the Year" contest and 23rd in the final Winston Cup point standings. c. 1985
Under a turnkey agreement with Elmo Langley (Langley) for 1985, Clark was to ride the entire season (28 races) on the Winston Cup circuit for a fee of $ 100,000, 80 percent of any car winnings, and all advertising and race bonus money. During 1985, Clark entered all 28 races on the NASCAR Winston Cup Circuit driving Elmo Langley's car. Dwyer Enterprises' performance during the 1985 season was as follows: Finishing
Name of Race
Location
Date
Position
Daytona 500
Daytona Beach, FL
2/17/85
18th
Miller High Life 400
Richmond, VA
2/24/85
18th
Carolina 500
Rockingham, NC
3/3/85
37th
Coca-Cola 500
Atlanta, GA
3/17/85
20th
Valleydale 500
Bristol, TN
3/31/85
14th
Transouth 500
Darlington, SC
4/14/85
26th
Northwestern Bank 400
North Wilkesboro,NC
4/21/85
18th
Sovran Bank 500
Martinsville, VA
4/28/85
17th
Winston 500
Talladega, AL
5/5/85
23rd
Budweiser 400
Dover, DE
5/19/85
28th
World 600
Charlotte, NC
5/26/85
23rd
Budweiser 400
Riverside, CA
6/2/85
16th
Diamond Mines 500
Pocono, PA
6/9/85
20th
Miller High Life 400
Brooklyn, MI
6/16/85
25th
Pepsi Firecracker 400
Daytona Beach, FL
7/4/85
25th
Summer 500
Pocono, PA
7/21/85
16th
Talladega 500
Talladega AL
7/28/85
20th
Champion Sparkplug 400
Brooklyn, MI
8/11/85
34th
Busch 500
Bristol, TN
8/24/85
18th
Southern 500
Darlington, SC
9/1/85
26th
Wrangler Sanforset 400
Richmond, VA
9/8/85
24th
Delaware 500
Dover, DE
9/15/85
30th
Goody's 500
Martinsville, VA
9/22/85
19th
Holly Farms 400
North Wilkesboro, NC
9/29/85
18th
Miller High Life 500
Charlotte, NC
10/6/85
16th
Nationwise 500
Rockingham, NC
10/20/85
24th
Atlanta Journal 500
Hampton, GA
11/3/85
40th
Winston Western 500
Riverside, CA
11/17/85
28th
*161 Clark won $ 128,710 in prize money in 1985 and finished 22d in the overall Winston Cup point standings. Dwyer Enterprises learned that a racing team run by its driver, Buddy Arrington (Arrington), might be available for some races since Arrington was considering retirement. This team had finished 20th in the 1985 NASCAR Winston Cup point standings, two places ahead of Clark, and won $ 153,222. Dwyer Enterprises and Arrington agreed for Clark to race the car on a turnkey basis, except tires. In exchange, Arrington was to be paid $ 10,000, plus two-thirds of all purse money. Dwyer Enterprises was entitled to use the rear quarter panels, hood, and rear deck lid for advertising and could retain any sponsor advertising it could sell. d. 1986
Dwyer Enterprises and Arrington agreed that Clark would drive one of Arrington's cars in the Daytona 500 at the start of 1986. This event offered total posted cash dollar awards of more than twice that offered for any other Winston Cup race. Dwyer Enterprises negotiated agreements for an $ 8,000 sponsorship in the Daytona 500 with Skip's Boot Barn, Daytona, Florida, and a $ 5,000 sponsorship with Dunhill Investments, Ltd., Denver, Colorado. *162 Dwyer Enterprises failed to make the Daytona 500 field when Clark, driving the Arrington car, qualified 41st for the 40-car field. Since Dwyer Enterprises failed to make the Daytona race, its advertising agreements with Skip's Boot Barn and Dunhill Investments, Ltd., were never consummated. Clark did not participate in any further races during 1986. For the rest of 1986, Dwyer Enterprises limited its racing activities to searching for a sponsor or a driving position for Clark on some other car owner's team which would not require payment of a ride fee by Dwyer Enterprises. Humpy Wheeler, manager of the Charlotte Motor Speedway, advised Dwyer Enterprises to go back to short track racing and try to win some races. 6. Promotional Activites
During the years at issue, Dwyer Enterprises undertook a number of efforts to promote its automobile racing car activities and to obtain a sponsor for these activities. In its search for sponsors, Dwyer Enterprises contacted Dan Cotter (Cotter), president of Cotter and Company, which is the cooperatively owned service provider and wholesaler for True Value Hardware. Clark met with Cotter in Chicago but was unable to obtain sponsorship *163 from True Value Hardware, which at the time was sponsoring an Indy race car. However, Dwyer Enterprises did obtain introductions to Radiator Specialty Company and Cooper Tools, a division of Cooper Industries, Inc., a Fortune 500 company located in Raleigh, North Carolina. Two meetings were held with Cooper Tools' representatives, including its president, vice president of sales and marketing, and director of marketing. Cooper Tools seriously considered the proposed sponsorship at an amount of $ 250,000 to $ 300,000 per year, utilizing the Arrington car, discussed above. The sponsorship did not materialize, however, because Cooper Tools had not previously sponsored a car, it was too costly, and Clark was not a sufficiently established driver. Dwyer Enterprises employed Steve Page, a sportswriter for the Colorado Springs Gazette Telegraph who was familiar with the news media, to assist in writing promotion material to be included with sponsor contact documents and press kits. Photographs of Dwyer Enterprises' race cars and drivers were also purchased. The professional services of David Mirisch Enterprises, a Beverly Hills, California, promotional firm, were engaged in spring *164 1983 to assist Dwyer Enterprises in promoting its racing activities and obtaining sponsors. The Patterson Agency, Inc., was also retained to act as a broker and contact person with Hamby. Dwyer Enterprises employed photographers and printers to produce two post cards, one each in 1984 and 1985, about its racing activities. The professional photographs, narrative material prepared by Steve Page, members of petitioners' family and David Mirisch Enterprises, together with newspaper articles, NASCAR printed materials, and post cards were combined to produce sponsor solicitation brochures and letters, press kits, and followup sponsor materials. Newspaper clippings, magazine articles, and personal background materials were added to the press kits, which were sometimes used as sponsor solicitation brochures or followup brochures, or used with individually written letters. Dwyer Enterprises purchased a book containing a list of advertising agencies nationwide, and used it to contact agencies to solicit them for possible sponsorship by the agencies' clients. One of the people contacted in this manner in 1983 and again in 1984 was Arnold Singer, an employee of Phillip Stagel Agency in *165 New York City. This agency represented Sansui Corporation and its TDK division, which was looking to sponsor a race car. Neither Sansui nor TDK had previously sponsored a race car. There were a number of contacts between Dwyer Enterprises and Singer, but a final sponsorship agreement was never made. Petitioners each devoted a great deal of time and effort, from 1981 through 1986, seeking a sponsor for Dwyer Enterprises' NASCAR Activities. Particularly time-consuming were the more than 2,000 letters written by Mrs. Dwyer to advertising agencies nationwide, including the Phillip Stagel Agency. 7. Records
Petitioner consulted with his accountant, Robert Elmerick, as to the books and records he would need to establish a NASCAR racing business. Elmerick was particularly qualified to advise petitioner in this regard because he had previously given accounting and business advice to persons involved in several professional sports. In addition to the records suggested by Elmerick, Dwyer Enterprises prepared other records to assist in operating the NASCAR activities, such as potential sponsor contract records, race packs, and revenue and expense budgets for race trips. Financial *166 records of Dwyer Enterprises for the years at issue were maintained through use of the Dwyer Enterprises' checking account, a VISA and two MasterCard credit cards, and manilla envelopes in which receipts for racing expenses were collected, generally related to a particular race event but sometimes also including other racing expense items, referred to as "trip packs." Spread sheets were constructed from these documents and ultimately Federal income tax returns were prepared by Elmerick. Petitioner's personal automobiles were insured under the same insurance policy with motor vehicles of Dwyer Enterprises because of the difficulty of obtaining auto insurance. 8. Petitioner's Agreements with Clark and Clark's Income
Petitioner and Clark entered into an agreement in 1979 relating to their racing effort. The agreement provided that they would be in the NASCAR racing business together. Petitioners would provide the necessary financing and would continue to support Clark until Clark could support himself. When not attending school, Clark would work full-time preparing the cars to race, performing maintenance, planning racing competitions, and taking care of the shop. Petitioner *167 would spend as much time as he could in the business given his full-time employment by LDS. All revenue from NASCAR activities would go into the pot. Petitioner would advance funds as needed to meet expenses and capital costs. A record would be kept through tax returns of petitioner's ongoing net investment in racing activities. Any excess cash flow was to be paid to petitioner until he had recouped his investment. Thereafter, profits were to be split 50-50 between petitioner and Clark. On December 4, 1986, several months after respondent issued petitioners a notice of deficiency disallowing deductions relating to their auto racing activity, petitioner entered into a written agreement with Clark concerning the sharing of profits and expenses of the auto racing activity. There was no separate written agreement for petitioners' support of Clark while Clark was racing. The oral agreements between petitioner and Clark provided for petitioners to support Clark so long as he was engaged in Dwyer Enterprises' auto racing activities. This was done. Clark filed Federal income tax returns prepared and signed by Elmerick for 1984, 1985, and 1986. With petitioner's consent, Clark reported *168 income derived from NASCAR racing in the amounts of $ 10,680, $ 13,524, and $ 630, respectively. Clark claimed deductions of $ 5,515, $ 2,110, and $ 0, respectively, from his racing activities in those years. Clark reported the income, which was used to pay his living expenses and related NASCAR racing expenses, and deductions on his Schedule C as income and deductions from a racing activity. Petitioners did not report the race prize winnings retained and reported by Clark as income on their returns in 1984, 1985, and 1986. Petitioners did not keep records of the amount of money paid to support Clark while he was engaged in auto racing. However, petitioners had canceled checks, credit card slips and bills, wire transfer notices, and information regarding Dwyer Enterprises and Clark's race winnings in 1984, 1985, and 1986, which constitute records of the monies used for Clark's racing activity. From 1983 to 1986, petitioners never considered sponsoring any driver other than Clark Dwyer. Petitioner enjoyed racing and enjoyed seeing Clark race. Nevertheless, petitioner voluntarily gave up racing when it became clear he could not drive profitably. NASCAR racing is a very dangerous *169 activity and Mrs. Dwyer did not enjoy watching petitioner or Clark racing. Clark derived satisfaction and public recognition from racing, but it required him to put in long hours in the shop and hard, dirty, physical work on the road. OPINION 1. Activity Not Engaged In For Profit
The issues are whether petitioner's auto racing activity in 1980 to 1981, and whether petitioner's auto racing activity relating to Clark during 1980 to 1986, were activities not engaged in for profit by petitioner within the meaning of section 183. If so, petitioner is allowed deductions attributable to the racing activity only to the extent of gross income earned from such activity, sec. 183(b)(2), and deductions which are allowable without regard to whether the activity was engaged in for profit. Sec. 183 (b)(1). An activity not engaged in for profit is any activity other than one for which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. Sec. 183(c). Section 162(a) allows a taxpayer to deduct all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. The test for determining *170 whether a taxpayer is carrying on a trade or business under section 162 is whether the taxpayer is engaged in the activity with the actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). While a reasonable expectation of profit is not required, petitioner's profit objective must be bona fide. Engdahl v. Commissioner, supra; Golanty v. Commissioner, supra at 425; Allen v. Commissioner, 72 T.C. 28, 33 (1979). Whether petitioner had an actual and honest profit objective in pursuing his auto racing activities is an issue of fact to be resolved on the basis of all of the facts and circumstances. Sec. 1.183-2(b), Income Tax Regs; Golanty v. Commissioner, supra. We give greater weight to the objective facts than to petitioner's mere statement of intent. *171 Sec. 1.183-2(a), Income Tax Regs; Dreicer v. Commissioner, supra.Petitioner bears the burden of proving that he possessed the requisite profit objective. Rule 142(a); Surloff v. Commissioner, 81 T.C. 210, 233 (1983); Dreicer v. Commissioner, 78 T.C. at 644-645; Golanty v. Commissioner, supra.In this context, "profit" means economic profit, independent of tax savings. Herrick v. Commissioner, 85 T.C. 237 (1985); Seaman v. Commissioner, 84 T.C. 564, 588 (1985); Surloff v. Commissioner, supra.
Section 1.183-2(b), Income Tax Regs., lists some of the factors to be considered in determining whether an activity is engaged in for profit. The include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history *172 of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is controlling. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Golanty v. Commissioner, 72 T.C. at 426; Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). In the case of auto racing, this Court has also considered whether or not the taxpayer has a sponsor and, if not, whether he has made reasonably prudent and bona fide efforts to obtain one. Conover v. Commissioner, T.C. Memo 1987-60; Woods v. Commissioner, T.C. Memo 1985-233; Casida v. Commissioner, T.C. Memo 1979-267. 2. Petitioner's Auto Racing Activity in 1980 to 1981
There are several factors indicating that petitioner carried on his racing activity in a businesslike manner. Petitioner operated the racing activity under the name Dwyer Enterprises. He discussed with his accountant the accounting, financial, *173 and tax aspects of the proposed NASCAR racing business, and maintained a separate bank account for Dwyer Enterprises. He kept records of his expenses incurred for his racing activity. Petitioner investigated the NASCAR racing business prior to embarking on the racing venture. He consulted with and followed the advice of a number of racing experts. However, a greater body of evidence shows that petitioner lacked the requisite profit objective. During 1980 and 1981 petitioner incurred substantial losses from his auto racing activity and did not make a profit in either year. Petitioner did not compete long enough (only two seasons) to enable him to potentially make a profit. Throughout his involvement in auto racing activities, petitioner had a full-time job which demanded much of his attention. Petitioner earned sufficient income from his real estate business to enable him to pursue auto racing and incur large losses therefrom. Petitioner's efforts to secure sponsorship for himself were sporadic. In addition, petitioner did not participate in any Winston Cup race during 1980 and 1981. Petitioner won no meaningful prize money. While not conclusive, a record of substantial *174 losses over the years and the unlikelihood of achieving a profitable operation are important factors bearing on petitioner's true objective. Golanty v. Commissioner, supra; Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). Petitioner derived personal pleasure from auto racing. We do not believe that business and pleasure are mutually exclusive. Jackson v. Commissioner, 59 T.C. 312, 317 (1972); Nichols v. Commissioner, T.C. Memo 1990-546; Green v. Commissioner, T.C. Memo 1989-599; Barton v. Commissioner, T.C. Memo 1980-179; McDonell v. Commissioner, T.C. Memo 1967-18. However, here it appears that petitioner engaged in his racing activities as a form of recreation. Although there were business aspects of petitioner's racing activity, we conclude, upon examining the facts of this case, that petitioner's auto racing activity was an activity not engaged in for profit. 3. Petitioners' Support of Clark's Auto Racing Activity in 1980 to 1986
We have frequently determined that *175 automobile or motorcycle racing activities were not engaged in for profit. See, e.g., Nichols v. Commissioner, T.C. Memo 1990-546; Schlafer v. Commissioner, T.C. Memo 1990-66; Stair v. Commissioner, T.C. Memo 1989-302; Smith v. Commissioner, T.C. Memo 1989-198; Hill v. Commissioner, T.C. Memo 1988-414; Kraettli v. Commissioner, T.C. Memo 1988-413; Conover v. Commissioner, T.C. Memo 1987-60. However, these cases generally involved racing activities where the purses were small and the taxpayers were unlikely to make a profit even if they won a number of races. Here, the purses were large (see appendix for list of posted awards). A top driver could make $ 1,000,000 in annual salary before bonus. Clark, and thus petitioner, conceivably could have made a significant profit by winning or finishing well in his races, and if he had obtained a sponsor. The situation here is similar to that of the taxpayer in Bolt v. Commissioner, 50 T.C. 1007 (1968), who was allowed to deduct his auto racing expenses where the evidence showed *176 that there was a "practical possibility" that the taxpayer could win enough money to exceed his expenses for the year. Bolt v. Commissioner, supra at 1014. See also Plunkett v. Commissioner, T.C. Memo 1984-170; Demler v. Commissioner, T.C. Memo 1966-117. The history of Clark's racing activity is consistent with an objective to make a profit. Petitioner investigated the NASCAR racing business prior to embarking on the racing venture. He consulted with racing experts, and he and Clark attended the Southards School of High Performance Circle Track Racing before participating in any races. Petitioner also discussed with his accountant the accounting, financial, and tax aspects of the proposed NASCAR racing business, and established a separate bank account for Dwyer Enterprises. Throughout Clark's racing activities, petitioner consulted with and followed the advice of a number of experienced NASCAR racing people in order to increase Dwyer Enterprises' opportunity to achieve financially successful operations. Efforts to gain experience and a willingness to follow expert advice are considered in determining profit *177 objective. Nickerson v. Commissioner, 700 F.2d 402, 407 (7th Cir. 1983). Dwyer Enterprises showed flexibility by changing its operating methods, trying new approaches, and discontinuing those methods that did not work. A change of operating methods or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may indicate a profit objective. Sec. 1.183-2(b) (1), Income Tax Regs.; Pirnia v. Commissioner, T.C. Memo 1989-627. Similarly, the speed with which a taxpayer ceases operations of an activity when he determines that they will not be profitable is an important factor evidencing his profit objective. See Feldman v. Commissioner, T.C. Memo 1988-126. Dwyer Enterprises carried on its NASCAR activities in a businesslike manner and maintained adequate and accurate books and records. Petitioner devoted many hours to Dwyer Enterprises' NASCAR Activities. For example, Mrs. Dwyer engaged in a vigorous letter-writing campaign in an effort to secure sponsorship; petitioners wrote promotional material, prepared press kits, and contacted numerous potential sponsors. Despite their efforts *178 to obtain a sponsor, they did not do so. However, their attempts to obtain a sponsor were similar to the activities of drivers who ultimately did obtain a sponsor. A history of losses may indicate that the activity was not engaged in for profit. Sec. 1.183-2(b) (6), Income Tax Regs. However, the objective to make a profit may exist even in the face of a history of losses unaccompanied by any gains. Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). "[T]he presence of losses in the formative years of a business * * * is not inconsistent with an intention to achieve a later profitable level of operation." Bessenyey v. Commissioner, supra at 274. Dwyer Enterprises incurred losses during all of the years at issue in this case. However, $ 60,000 of the 1981 loss of $ 166,422 was attributable to theft which was unexpected and beyond the control of Dwyer Enterprises. Likewise, a portion of the 1982 loss resulted from three car wrecks, two of which occurred in late stages of a race in which Clark was running well, thus costing Dwyer Enterprises potential prize money. Dwyer Enterprises' *179 losses were incurred in the startup stage of a very competitive business in which only a few are successful. The losses sustained by Dwyer Enterprises were not sustained for a period beyond that which is customarily necessary for a NASCAR racing operation to achieve profitable status. The fact that Clark derived personal pleasure from auto racing is not sufficient to cause it to be classified as not engaged in for profit if the activity is, in fact, engaged in for profit as evidenced by other factors. Sec. 1.183-2(b) (9), Income Tax Regs.; Pirnia v. Commissioner, supra. We note that a business will not be turned into a hobby merely because the owner finds it pleasurable; suffering is not a prerequisite to deductibility. Jackson v. Commissioner,59 T.C. 312, 317 (1972); Green v. Commissioner, T.C. Memo 1989-599. Petitioner entered the NASCAR racing business in 1980 believing Clark would be a successful driver and that he could make a profit from Clark's racing. We hold that petitioner's sponsorship of Clark's auto racing during 1980 to 1986 was an activity engaged in for profit. Accordingly, petitioners may deduct *180 53 percent of their expenses relating to Clark's racing activity in 1980, and 62 percent of their expenses relating to Clark's racing activity in 1981. Decisions will be entered under Rule 155.
APPENDIX Posted awards for the NASCAR Winston Cup races participated in by Dwyer Enterprises are as follows: Name of Race
Date
Posted Awards
Daytona 500
2/20/83
$ 1,015,577
Winston 500
5/1/83
430,815
Pepsi Firecracker 400
7/4/83
327,440
Like Cola 500
7/24/83
301,185
Budweiser 500
9/18/83
244,325
Daytona 500
2/19/84
1,172,131
Miller High Life 400
2/26/84
243,256
Carolina 500
3/4/84
290,191
Coca-Cola 500
3/18/84
359,315
Valleydale 500
4/1/84
219,165
Northwestern Bank 400
4/8/84
227,290
Transouth 500
4/15/84
311,865
Sovran Bank 500
4/29/84
250,300
Winston 500
5/6/84
475,715
Coors 420
5/12/84
217,465
Budweiser 500
5/20/84
276,490
World 600
5/27/84
538,965
Budweiser 400
6/3/84
271,715
Diamond Mines 500
6/10/84
341,140
Miller High Life 400
6/17/84
378,055
Pepsi Firecracker 400
7/4/84
387,300
Pepsi 420
7/14/84
206,800
Like Cola 500
7/22/84
347,975
Talladega 500
7/29/84
415,725
Champion Sparkplug 400
8/12/84
351,715
Busch 500
8/25/84
228,800
Southern 500
9/2/84
377,510
Wrangler Sanforset 400
9/9/84
244,640
Delaware 500
9/16/84
287,200
American 500
10/21/84
283,415
Winston Western 500
11/18/84
303,050
Daytona 500
2/17/85
1,277,815
Miller High Life 400
2/24/85
263,355
Carolina 500
3/3/85
353,440
Coca-Cola 500
3/17/85
381,140
Valleydale 500
3/31/85
242,885
Transouth 500
4/14/85
338,350
Northwestern Bank 400
4/21/85
246,850
Sovran Bank 500
4/28/85
278,410
Winston 500
5/5/85
504,275
Budweiser 500
5/19/85
347,845
World 600
5/26/85
600,000
Budweiser 400
6/2/85
301,720
Diamond Mines 500
6/9/85
384,470
Miller High Life 400
6/16/85
403,960
Pepsi Firecracker 400
7/4/85
428,295
Summer 500
7/21/85
383,395
Talladega 500
7/28/85
450,000
Champion Sparkplug 400
8/11/85
387,835
Busch 500
8/24/85
257,670
Southern 500
9/1/85
410,470
Wrangler Sanforset 400
9/8/85
262,310
Delaware 500
9/15/85
358,095
Goody's 500
9/22/85
279,790
Holly Farms 400
9/29/85
249,720
Miller High Life 500
10/6/85
506,185
Nationwise 500
10/20/85
355,310
Atlanta Journal 500
11/3/85
366,595
Winston Western 500
11/17/85
342,520
*181 Footnotes
1. Respondent concedes that petitioners are not liable for the additions to tax under sections 6653(a), 6653(a)(1), 6653(a)(2), and 6661, and for the increased interest under section 6621(c) for taxable years 1980 through 1986.↩
2. All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Respondent determined that petitioners were liable for the addition to tax under section 6653(a)(1) and (2) for negligence. The appropriate section for taxable year 1986 is section 6653(a)(1)(A) and (B).↩
*. 50% of the interest due on $ 10,411, $ 91,038, $ 14,541, $ 13,390, $ 8,947, and $ 4,600 for taxable years 1981, 1982, 1983, 1984, 1985, and 1986, respectively.↩
4. Prior to the Tax Reform Act of 1986, section 6621(c) was designated section 6621(d). Sec. 1511(a), Pub. L. 99-514, 100 Stat. 2085, 2744.↩
**. The interest due under section 6621(c) is 120% of the interest due on $ 26,708, $ 22,218, $ 91,038, $ 47,935, $ 53,591, $ 62,933, and $ 10,990 for taxable years 1980, 1981, 1982, 1983, 1984, 1985, and 1986, respectively.↩
5. For purposes of this case, a "race team" consists of a driver and between one and four other individuals. Unless otherwise noted, a "race team," as used herein, did not include petitioner in races outside the State of Colorado during the years 1980 through 1982.↩
6. The parties agree that, in the event this loss is not fully deductible under section 162 as an ordinary and necessary trade or business expense because of section 183, the entire amount is deductible as a casualty loss under section 165 for taxable year 1981.↩
7. A "race pack" typically contained time sheets, petitioner's race notes regarding lap times and track peculiarities, race rules, entry forms, and lists showing purses and awards.↩